H. P. HOOD & SONS, INC. ET AL. *v.* UNITED
STATES ET AL.*

No. 772.   Argued April 25, 26, 1939.—Decided June 5, 1939.

*Together with No. 809, *Whiting Milk Co.* v. *United States et al.*,
and No. 865, *Branon* v. *United States et al.*, also on writs of certi-
orari to the Circuit Court of Appeals for the First Circuit.

*Mr. Charles B. Rugg,* with whom *Messrs. Edward F. Merrill, Warren F. Farr, H. Brian Holland,* and *Archibald Cox* were on the brief, for petitioners in Nos. 772 and 865.

*Mr. John M. Raymond,* with whom *Messrs. Lawrence Foster* and *Augustin H. Parker, Jr.* were on the brief, for petitioner in No. 809.

*Solicitor General Jackson,* with whom *Assistant Attorney General Arnold* and *Messrs. Hugh B. Cox, James C. Wilson,* and *Robert K. McConnaughey* were on a brief in Nos. 772 and 809, for respondents.

MR. JUSTICE REED delivered the opinion of the Court.

These cases involve the constitutionality of the Agricultural Marketing Agreement Act of 1937 [1] as applied in an order of the Secretary of Agriculture regulating the handling of milk in the Greater Boston, Massachusetts, Marketing Area.

The petitioners, H. P. Hood & Sons, Inc., and Noble's Milk Company of No. 772 and Whiting Milk Company of No. 809, original defendants below, are engaged in handling milk in the marketing area in the current of interstate commerce or in a manner which burdens that commerce. Producers intervened as defendants, petitioner E. Frank Branon on the side of H. P. Hood & Sons and Chester D. Noyes beside the Whiting Company. The respondents, plaintiffs below, are the United States of America and the Secretary of Agriculture. The parties will be referred to as defendants and plaintiffs, respectively.

It is unnecessary to detail the facts of each case. They are two of many instituted by the plaintiffs to secure obedience to the Order. On October 1, 1937, bills of complaint were filed in the District Court for the District of Massachusetts, 21 F. Supp. 321, for the purpose of enjoining Hood & Sons, Noble's Milk Company and

---

[1] Act of June 3, 1937, 50 Stat. 246.

Whiting Milk Company from violating the terms of Order No. 4 as amended. A temporary mandatory injunction issued on November 30, 1937. A supersedeas followed soon after, conditioned upon payment by the three handlers into the registry of the court of the amounts billed to them by the Market Administrator for equalization charges and marketing services under the Order. Answers to the bills asserted constitutional infirmities in the Act and fatal weaknesses in the Order as amended. A Special Master was charged with the duty of finding the facts in these and similar suits. His report was filed on January 27, 1939. Shortly thereafter, the District Court confirmed the report, sustained both the Act and the Order, and entered a decree for the plaintiffs. The defendants took an appeal to the Circuit Court of Appeals and, after the cases were docketed, filed petitions for writs of certiorari. The writs were granted because important questions of federal law undecided by this Court were involved and pending appeals in other cases with similar issues were ready for argument.

The pertinent provisions of the Marketing Act have been summarized in *United States* v. *Rock Royal Cooperative, ante,* p. 533. They will not be repeated here.

Order No. 4, as amended, which the plaintiffs seek to enforce, is the culmination of an extended effort by the Secretary to work out a plan to regulate the marketing of milk in the Boston area. Order No. 4 was originally issued on February 7, 1936, under the Agricultural Adjustment Act.[2] All steps leading to its issuance were taken. On November 30, 1935, the Secretary gave notice of a public hearing on a proposed marketing agreement and order. Hearings were held. A marketing agreement was tentatively approved which handlers failed to accept.

---

[2] Act of May 12, 1933, 48 Stat. 31, as amended August 24, 1935, 49 Stat. 750.

On January 25, 1936, the Secretary found and proclaimed that the purchasing power of milk could not be satisfactorily determined for the pre-war base period from available statistics in the Department of Agriculture, but could for the post-war period. August, 1919, to July, 1929, was declared the base period for the purpose of issuing an order. On February 5, 1936, the Secretary made a determination, as required by § 8c (9), as to the necessity for issuing an order. The President approved the determination, and the Order issued. It remained in effect until August 1, 1936, shortly after the District Court for the District of Massachusetts held that the Act under which the Order was issued was unconstitutional.[3] On that day the Secretary suspended the Order for an indefinite time.

After the passage of the Marketing Act, the Secretary, on June 24, 1937, gave notice of a hearing upon proposed amendments to Order No. 4. On the following day he terminated the suspension of the formal and administrative provisions as of July 1, and of the price-fixing provisions as of August 1. Hearings were held. A proposed marketing agreement failed of approval by the handlers. On July 17, 1937, a referendum took place. It will be discussed later at some length because of contentions which question its validity. On July 27, 1937, acting pursuant to § 8c (9), the Secretary determined that the failure of the handlers to sign tended to prevent effectuation of the declared policy of the Act; that issuance of the proposed amendments to the Order was the only practical means of advancing the interests of milk producers in the area; and that the issuance was approved by over 70 percent of the producers who during May, 1937, were engaged in the production of milk for sale in the area. The President approved the determina-

---

[3] *United States* v. *David Buttrick Co.*, 15 F. Supp. 655, reversed in 91 F. 2d 66.

tion. On July 28, 1937, "Order No. 4; Amendment No. 1" issued. In it the Secretary made findings upon the evidence introduced at the hearings upon the proposed amendments and ratified the original findings in so far as they were not in conflict with the new ones. He made no finding or proclamation, as he had in the original Order, that satisfactory statistics were not available for the pre-war period but were for the post-war period. It is not disputed that the latter was used as the base period for the purpose of computing the prices to be used in the amended Order.

This amended Order is based upon the same principles discussed in *United States* v. *Rock Royal Co-operative, ante,* p. 533, and companion cases, decided today. It establishes a comprehensive scheme for the regulation of milk handled in interstate or foreign commerce in an area which includes Boston and 36 other cities or towns. A Market Administrator, appointed by the Secretary of Agriculture, is in charge. Producers and handlers are defined, the first as any person producing milk in conformity with the health regulations applicable to milk sold for consumption as milk in the marketing area, the second as all, including producers or associations of producers, who engage "in such handling of milk, which is sold as milk or cream in the Marketing Area, as is in the current of interstate commerce or which directly burdens, obstructs, or affects interstate or foreign commerce in milk and its products."

There are two use classifications, roughly, fluid and non-fluid. A price is stated for Class I or fluid milk; a formula, based primarily on the price of cream in Boston and casein in New York, is provided for the calculation of the Class II price for each delivery period. Minimum prices determine the value of all the milk delivered by all producers to all the handlers subject to the Order. Except to associations of producers for Class I milk, pay-

ment to producers is made at a blended price. The Administrator computes the value of milk for each handler by multiplying the quantities used by him in each class by the class price, and by adding the two results. Then the values for all handlers are combined into one total. Adjustments are made for differentials. The adjusted total is divided by the total quantity of milk. The result is a weighted average price somewhere between the two class prices, known as the "blended price." Each handler pays his producers at the blended price. The amount paid to producers may be less, or it may be more, than the value of the milk sold by the handler. Equalization is made among handlers. As the Order puts it, after paying his own producers, each handler pays "To producers, through the Market Administrator, by paying to or receiving from the Market Administrator, as the case may be, the amount by which payments made . . . are less than, or exceed, the value of milk as required to be computed for such handler. . . ."

The defendants urge that the decree of the District Court should be reversed because of error under the Constitution, under the statute, under the Order itself. It is contended that the equalization provisions of the amended Order violate the due process clause of the Fifth Amendment; that the price fixing features of the Act and Order constitute an invalid exercise of the power to regulate commerce and an invasion of the powers reserved to the states under the Tenth Amendment; [4] and that the Act involves delegation of legislative power. The amendments to the Order are said to be void because an essential finding required by the statute is lacking. The referendum among producers is assailed as improperly conducted. And the defendants in No. 772 raise the point that the Market Administrator failed to comply with the provisions of the amended Order.

---

[4] Only defendant in No. 809 makes this contention.

*Constitutionality.*—There is nothing to be added to the discussion of the constitutionality of the Act in *United States* v. *Rock Royal Co-operative, ante,* p. 533. The discussion there of the validity of the amended Order, in so far as similar issues are raised in this case, is also determinative.

*Order Amended without Finding as to Base Period.*— Order No. 4, as amended, is the controlling regulation in these cases. As authorized by § 8e [5] it used a post-war period as the base period to determine prices. The finding and proclamation by the Secretary as to the absence of statistics for the pre-war period, available for use, were made for the original issue of Order No. 4 but not for the amendments. Section 8c (17) makes certain sections, including 8e, applicable to amendments of orders. It reads thus: "The provisions of this section, section 8d, and section 8e applicable to orders shall be applicable to amendments to orders. . . ." Defendants contend that this requires a finding and proclamation under § 8e each time an order which includes a post-war base period is amended in any particular.

Ordinarily the base period of § 2 is to be used. It is only after a finding that the purchasing power of the commodity during the period fixed in § 2 cannot be satisfactorily determined from available statistics of the Department of Agriculture that the Secretary by § 8e

---

[5] "Sec. 8e. In connection with the making of any marketing agreement or the issuance of any order, if the Secretary finds and proclaims that, as to any commodity specified in such marketing agreement or order, the purchasing power during the base period specified for such commodity in section 2 of this title cannot be satisfactorily determined from available statistics of the Department of Agriculture, the base period, for the purposes of such marketing agreement or order, shall be the post-war period, August 1919–July 1929, or all that portion thereof for which the Secretary finds and proclaims that the purchasing power of such commodity can be satisfactorily determined from available statistics of the Department of Agriculture."

is authorized to find and proclaim the post-war base period. By § 8c. (1) the Secretary is authorized to issue "and from time to time amend" orders. Obviously, as a general clause to make all the provisions of §§ 8c, 8d and 8e applicable to amendments, § 8c (17) was adopted. Without it questions would have been pertinent as to the applicability to amended orders of various provisions in these sections. Doubt would arise as to the power to change the base period after it was once determined. There would seem to be no occasion to review the absence of satisfactory statistics, however, on a proposed amendment which does not involve any change in the base period. The requirement for finding and proclamation in adopting a base period is not intended to force the Secretary to go through a meaningless-ritual. A determination of the necessity of using the post-war base period once made and proclaimed satisfies the conditions of §§ 8c (17) and 8e for amendments, so long as no amendment is made which involves a change in the base period. This has been the administrative construction [6] where amendments have been made to orders which had utilized a post-war base period. The plaintiffs show this by a series of references to the Federal Register which are not challenged.[7]

---

[6] *Armstrong Paint & Varnish Works* v. *Nu-Enamel Corp.*, 305 U. S. 315, 329.

[7] "Order No. 2, amended June 5, 1936 (1 Fed. Reg. 549); Order No. 3, amended April 13, 1936 (1 Fed. Reg. 185), and March 29, 1937 (2 Fed. Reg. 616), and March 31, 1939 (4 Fed. Reg. 1404); Order No. 4, amended July 28, 1937 (2 Fed. Reg. 1331), and January 13, 1939 (4 Fed. Reg. 249); Order No. 5, amended March 29, 1937 (2 Fed. Reg. 614); Order No. 7, amended October 24, 1936 (1 Fed. Reg. 1662); Order No. 11, amended November 17, 1936 (1 Fed. Reg. 1979); Order No. 12, amended February 24, 1937 (2 Fed. Reg. 354); Order No. 15, proclamation dated September 10, 1938 (3 Fed. Reg. 2222), amendment dated September 10, 1938 (3 Fed. Reg. 2222); Order No. 20, amended August 15, 1938 (3 Fed. Reg. 2015)."

*Validity of the Referendum.*—The referendum is challenged as conducted contrary to the terms of the Act. Section 8c (9) (B) authorizes the Secretary of Agriculture to issue an order, notwithstanding the failure of handlers to approve a marketing agreement, if he makes certain determinations, one of them that the issuance is approved by at least two-thirds of the producers who, during a representative period, "have been engaged in the production of such commodity for sale in the marketing area. . . ." [8] Under § 8c (19) the Secretary "may conduct a referendum among producers" to ascertain whether two-thirds approve. He restricted voting in the referendum under scrutiny, to producers who had delivered milk to a station approved for the shipment of milk to the marketing area and which had shipped milk or cream to the marketing area during the representative period.

It is said that the Secretary by this restriction disregarded the language of the statute as to producers eligible to vote and that the ballot was either accorded to producers not entitled to vote or denied to qualified producers. Specifically, the following errors are urged: (1) A large number of southern and western producers who delivered to stations shipping cream were not permitted to vote. (2) Many New England or Eastern New York producers voted who delivered to handlers at plants which shipped only cream in the representative period. (3) Many voted who produced milk on farms as to which no certificate of registration had been issued, as required by §§ 16A and 16C of the Massachusetts milk law. [9] (4) A number of approving producers delivered milk to stations which shipped less than 50 percent of their product to the Boston area. (5) Coöperatives cast votes in favor of the

[8] The alternative provisions may be disregarded in this case.

[9] Mass. Ann. Laws, c. 94, §§ 12–48.

amendments to the Order solely through ballots cast by their boards of directors. Inclusion of the southern and western shippers of cream or elimination of any one of the remaining groups might have changed the result of the referendum.

It does not seem profitable to expand each of the contentions of the defendants. The question is simply whether the statute was followed. It seems to us that it was.

The Act does not supply the Secretary with detailed directions as to the manner of holding a referendum. Its language is general. The Secretary "may conduct a referendum among producers." [10] What producers? Those "engaged in the production of [milk] for sale in the marketing area. . . ." [11] Every producer who voted was so engaged. Each delivered milk to the plant of a handler licensed [12] to distribute and sell fluid milk in the marketing area. The Order is aimed at the handling of milk marketed in the area. The problems to be solved are those engendered by the necessary, yet troublesome, surplus of fluid milk. Every handler to whom the voters delivered contributed to that surplus.

The milk of the southern and western producers outside the milk-shed could not be sent into the marketing area in fluid form, for their handlers were not licensed to sell milk in the area. The station in Indiana, used in the hearings as illustrative of the situation, held a license for the emergency shipments of sweet cream only. The exclusion of the southern and western producers, therefore, was proper. They are located outside the Boston milk-shed; they do not produce any part of the burdensome surplus of fluid milk.

---

[10] § 8c (19).
[11] § 8c (9) (B) (i).
[12] Mass. Ann. Laws, c. 94, § 40.

There was no error in permitting the remaining groups of producers to vote. That some handlers to whom voting producers delivered milk shipped only cream during the representative period is immaterial. The farmers, it was found, cannot tell when they bring in their milk whether it will be sold by the handlers as milk or cream. As these handlers could have sent the fluid milk to the area, and in most instances did, at times other than the representative period, the milk delivered to them was a potential part of the surplus. The producers who lacked certificates of registration were properly included. Their milk was sold in the area by licensed handlers.[13] Nor can it make any difference that less than 50 percent of the milk of some stations was shipped to the marketing area during the representative period. There is nothing in the Act that compels adopting 50 percent as determinative. It was enough that the handlers of these producers did send some part, and could have sent all.

Two coöperatives voted for their members in favor of the amendments to the Order.[14] No poll was taken of the individual producer members. Nor was there any subsequent approval by them of the action taken on their behalf by the coöperatives. Section 8c (12) directs the Secretary to consider the approval or disapproval of coöperatives as the approval or disapproval of members. This is complete authority for the action of the Secretary. He need not require further referendums by coöperatives themselves. Presumably they will vote with an eye to the best interest of their members.

*Violation of Order.* The decree directs the defendants to pay to the Market Administrator for distribution to the producers through the equalization fund the amounts

---

[13] Compare the discussion under the next heading, *Violation of Order*.

[14] See *United States* v. *Rock Royal Co-operative, ante,* 533, 556.

which he had billed to them under the Order. The de-. fendants H. P. Hood & Sons and Noble's Milk Company contend that the bills include in their computation milk plainly excluded by the terms of the Order because the product of dairies without the certificates of registration required by Massachusetts General Laws, Chapter 94, §§ 16A *et seq.* Under these sections no person may sell milk known to have been produced on unregistered farms. It is not disputed that milk from such farms figured in the operation of the equalization pool. The explanation of the plaintiffs is that the Order covers this milk.

The Administrator seeks payment on the basis of all milk received by licensed handlers for use in the Marketing Area. It was found that milk received at a country plant was included in the computation if the Administrator knew the plant was approved for shipment of fluid milk by a city or town of the marketing area. By statute handlers are required to have a license to handle milk in any town where an inspector of milk is appointed and a permit from the local board of health,[15] and they must register with the director of the dairying division of the state department of agriculture.[16]

As the action of handlers forms the ground for the initiation of regulation under the Act[17] and for classification,

---

[15] Mass. Ann. Laws, c. 94, §§ 40, 43.

[16] *Id.*, § 16F.

[17] § 8c. "(1) The Secretary of Agriculture shall, subject to the provisions of this section, issue, and from time to time amend, orders applicable to processors, associations of producers, and others engaged in the handling of any agricultural commodity or product thereof specified in subsection (2) of this section. Such persons are referred to in this title as 'handlers.' Such orders shall regulate, in the manner hereinafter in this section provided, only such handling of such agricultural commodity, or product thereof, as is in the current of interstate or foreign commerce, or which directly burdens, obstructs, or affects, interstate or foreign commerce in such commodity or product thereof."

reports, calculation and payment under the Order,[18] we conclude that the milk received by handlers for use in the area is the proper basis of computation. True, the reports are based on the delivery of milk by defined producers but in view of the terms of the Order as a whole,

---

[18] Article III. "Section 1. *Sales and Use Classification.*—Milk purchased or handled by handlers shall be classified as follows:

"1. All milk sold or distributed as milk, chocolate milk, or flavored milk and all milk not specifically accounted for as Class II milk shall be Class I milk; and

"2. Milk specifically accounted for (a) as being sold, distributed, or disposed of other than as milk, chocolate milk, or flavored milk and (b) as actual plant shrinkage within reasonable limits shall be Class II milk."

Article V. "Section 1. *Periodic Reports.*—On or before the eighth day after the end of each delivery period, each handler shall, except as set forth in section 1 of article VI, with respect to milk or cream which was, during such delivery period, (a) received from producers, (b) received from handlers, or (c) produced by such handler, report to the Market Administrator in the detail and form prescribed by the Market Administrator, as follows:

"1. The receipts at each plant from producers who are not handlers;

"2. The receipts at each plant from any other handler, including any handler who is also a producer;

"3. The quantity, if any, produced by such handler; and

"4. The respective quantities of milk which were sold, distributed, or used, including sales to other handlers, for the purpose of classification pursuant to article III."

Article VII. "Section 1. *Computation of Value of Milk for Each Handler.*—For each delivery period the Market Administrator shall compute, subject to the provisions of article VI, the value of milk sold or used by each handler, which was not purchased from other handlers, by (a) multiplying the quantity of such milk in each class by the price applicable pursuant to sections 2, 3, and 4 of article IV and (b) adding together the resulting value of each class."

Article VIII. "Section 1. *Time and Method of Payment.*—On or before the 25th day after the end of each delivery period each handler shall make payment, subject to the butterfat differential set forth in section 3 of this article, for the total value of milk received during

we are of the opinion the milk from unregistered farms must also be reported. The Act and Order regulate marketing. In violating the state health laws by knowingly selling. milk from unregistered farms, producers, and handlers may risk prosecution by the Massachusetts authorities. Nevertheless, the handlers must conform to the Order. It is the milk handled, not the milk produced, which is determinative. The Administrator was justified in using milk received at an approved, plant for computation. It may be added that under the state and town regulations the municipalities in the marketing area, through their control over licenses and permits, have the power to supervise the handlers to see that they comply with the law forbidding sales from unlicensed farms.[19]

The further contention is made that the Secretary failed to make a finding as to the tendency of the rein-

such delivery period as required to be computed pursuant to section 1 of article VII, as follows:

"1. To each producer, except as set forth in paragraph 2 of this section, at the blended price per hundredweight computed pursuant to section 2 of article VII, subject to the differentials set forth in section 4 of this article, for the quantity of milk delivered by such producer;

"2. To any producer, who did not regularly sell milk for a period of thirty days prior to the effective date hereof to a handler or to persons within the Marketing Area, at the Class II price, in effect for the plant at which such producer delivered milk, for all the milk delivered by such producer during the period beginning with the first regular delivery of such producer and continuing until the end of two full calendar months following the first day of the next succeeding calendar month;

"3. To producers, through the Market Administrator, by paying to or receiving from the Market Administrator, as the case may be, the amount by which the payments made pursuant to paragraphs 1 and 2 of this section are less than, or exceed, the value of milk as required to be computed for such handler pursuant to section 1 of article VII, as shown in a statement rendered by the Market Administrator on or before the twentieth day after the end of such delivery period."

[19] Mass. Ann. Laws, c. 6 and c. 94, §§ 16A, 16F, 40, 41, 43.

statement of the original Order to effectuate the policy of the Act. This is conceded. The Order was reinstated in part as of July 1, 1937. It was thereafter amended after hearings and on July 28, 1937, the Order as amended was promulgated with the finding "That the issuance of the amendment to the order and all of the terms and conditions of the order, as amended, will tend to effectuate the declared policy of the act." We are of the view that this finding cured any omission, if such a finding prior to reinstatement were necessary, as to which we express no opinion. While Order No. 4 was partly in effect prior to this amendment, the finding covered the entire Order No. 4 as amended, and the language of the Order promulgating the amendments is an approval of Order No. 4 as amended, as tending to effectuate the declared policy of the Act.

Other contentions are made which have been considered but they do not seem to require any statement.

*Affirmed.*

MR. JUSTICE ROBERTS, dissenting.

I regret that I cannot concur in the Court's disposition of these cases. I find it unnecessary to consider whether the order complied with the terms of the Act or whether the Act or the order deprived the appellees of their property without due process. I am of opinion that the Act unconstitutionally delegates legislative power to the Secretary of Agriculture.

Valid delegation is limited to the execution of a law. If power is delegated to make a law, or to refrain from making it, or to determine what the law shall command or prohibit, the delegation ignores and transgresses the Constitutional division of power between the legislative and the executive branches of the government.

In my view the Act vests in the Secretary authority to determine, first, what of a number of enumerated com-

modities shall be regulated; second, in what areas the commodity shall be regulated; third, the period of regulation, and, fourth, the character of regulation to be imposed; and, for these reasons, cannot be sustained.

The statute is an attempted delegation to an executive officer of authority to impose regulations within supposed limits and according to supposed standards so vague as in effect to invest him with uncontrolled power of legislation. Congress has not directed that the marketing of milk shall be regulated. Congress has not directed that regulation shall be imposed throughout the United States or in any specified portion thereof. It has left the choice of both locations and areas to the Secretary. Congress has not provided that regulation anywhere shall become effective at any specified date, or remain effective for any specified period. Congress has permitted such a variety of forms of regulation as to invest the Secretary with a choice of discrete systems each having the characteristics of an independent and complete statute.

Section 8c (2) provides that the Secretary may make orders in respect of eight specified agricultural products. It embodies no directions as to the specific conditions which shall move him to issue orders affecting each of the named commodities. The same section permits the promulgation of orders applicable to specified regions. It omits any restriction or direction as to the size or location of the area to be affected by a regional order. It leaves the Secretary free to determine when regulation shall become effective, when it shall be terminated throughout the United States or in any portion thereof.

The supposed standards by which the Secretary is to be governed turn out, upon examination, to be no standards whatever. All of the choices mentioned are, according to the Act, to be made if the Secretary has reason

to believe, or finds, that his proposed action will "tend to effectuate the declared policy" of the Act.*

We turn, therefore, to § 2, which declares the policy of the Congress to be: "through the exercise of the powers conferred upon the Secretary of Agriculture under this title, to establish and maintain such orderly marketing conditions for agricultural commodities in interstate commerce as will establish prices to farmers at a level that will give agricultural commodities a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the base period," which base period is defined as a period of years antedating the passage of the Act. The section further declares the policy to be worked out through the Secretary to be "To protect the interest of the consumer by (a) approaching the level of prices which it is declared to be the policy of Congress to establish in subsection (1) of this section by gradual correction of the current level at as rapid a rate as the Secretary of Agriculture deems to be in the public interest and feasible in view of the current consumptive demand in domestic and foreign markets, and (b) authorizing no action under this title which has for its purpose the maintenance of prices to farmers above the level which it is declared to be the policy of Congress to establish in subsection (1) of this section."

Assuming that any of these proposed ends or aims were in themselves capable of reasonable definition, it is, nevertheless, evident that the Secretary is to form a judgment by balancing a price raising policy against a consumer-protection policy, according to his views of feasibility and public interest.

If then the separate objects to be attained were matters susceptible of a definite finding there would still be

---

*See § 8c (3), 8c (4), 8c (16).

the inescapable result that, after such definite finding as to each proposed aim, there must be an exercise of judgment as to the extent to which that aim should be accomplished in the light of other and conflicting aims. And there would still remain the fact that the conclusion might be against any regulation by reason of the Secretary's unrestrained judgment that, in the circumstances, regulation is not "feasible."

Enough has been said to show that a law is to come into being on the basis of the Secretary's sole judgment as to its probable effect upon the milk industry, its probable effect upon the consumer, its probable consonance with the public interest, and its feasibility. The resolution of all such problems is of the essence of law making.

But if, as the Act discloses, the supposed standards whereby the Secretary is to ascertain the elements which are to determine his ultimate decision are themselves so vague that neither he nor anyone can accurately apply them, the unlimited nature of the delegation becomes even clearer.

The first thing the Secretary is permitted to accomplish by regulation, so the statute declares, is the parity in purchasing power of the price to be received by producers with that received in the base period. This parity is to be in terms of things farmers purchase. A moment's reflection will show that any calculation of such parity is impossible. The things farmers purchase, the relative quantities in which they purchase them, and their price in terms of milk, vary from month to month and from year to year. Moreover, the Secretary is not to establish a parity between two past periods but is to regulate the industry in such fashion as will, in his opinion, produce for the future a parity of the purchasing power of milk with its purchasing power in the base period. The Secretary's conclusion must lie in the realm of hope or opinion and not in that of ascertained fact. The major objective of

the Act is in truth to raise prices paid farmers for milk. The upward limit is really left to the Secretary's uncontrolled discretion.

Turn now to another alleged standard which is to control the Secretary's action. He is not to raise prices so fast as to injure the interest of the consumer but is to raise them gradually by correction of the current level at as rapid a rate as he deems to be in the public interest and feasible in view of consumptive demand. It is fair to ask whether this constitutes a standard at all. What is the public interest? Must not Congress ascertain and declare it? What is feasible in the way of regulation? Is not this a matter for legislative judgment. How is any one to tell whether the Secretary has disobeyed the mandate of Congress in these respects?

There is in the Act a further delegation of power. Congress might, although committing to the Secretary's will and judgment the matters above enumerated, have directed him how to regulate the industry if he determined so to do. It might have considered the possible modes of regulation and provided which of them the Secretary should adopt. The Act does no such thing. It leaves to the Secretary the choice of different and mutually exclusive methods of control.

Section 8c (5) applies to orders affecting milk and its products. Section 8c (7) refers to orders affecting any of the commodities named in the Act. The first requires that any order affecting milk must contain one, and may contain others, of seven specified conditions. The second requires that in any order there must be included one, and there may be included others, or four conditions. These sections give the Secretary the choice of three independent programs for raising the price of milk, namely, bargaining with handlers, stabilizing the retail price, or fixing prices to be paid producers. Within each, variation of the widest sort is allowed. Moreover, the Act permits alternative schemes for distributing amongst the

producers the dollar value of milk sold in the area to which the Secretary's order applies. The differences between the permissible schemes are not matters of mere detail but are basic and fundamental.

In respect of the choice of method, the only guide is the declaration of policy embodied in § 2. If the Secretary is of opinion that one method is more likely to raise prices than another he is at liberty to put into the form of an order what is tantamount to a statute prescribing the method of his choice. Thus the Secretary is to decide not only whether there is to be a law but, as well, the nature of the law to be enacted.

What was said concerning unconstitutional delegation of legislative power in *Panama Refining Co.* v. *Ryan,* 293 U. S. 388, and *Schechter Poultry Corp.* v. *United States,* 295 U. S. 495, applies with equal force here. Comparison of the provisions of the Act respecting flue-cured tobacco, which are summarized in *Mulford* v. *Smith, ante,* p. 38, with those applicable to milk, will disclose the fundamental difference between the administrative character of the powers delegated in the case of tobacco and the legislative character of those delegated in the case of milk. No authority cited by the Government presents a situation comparable to that here disclosed. It would not be profitable to analyze each of the cases because in each the question of the nature of the statutory standard and its application in the administration of the statute involved depended upon the field which the legislation covered. Where delegation has been sustained the court has been careful to point out the circumstances which made it possible to prescribe a standard by which administrative action was confined and directed. Such a standard, as respects milk marketing, is lacking in the Agricultural Marketing Agreement Act of 1937.

I think that the decree should be reversed.

MR. JUSTICE MCREYNOLDS and MR. JUSTICE BUTLER join in this opinion.