## COLUMBIA RIVER PACKERS ASS'N, Inc., v. HINTON et al.

District Court, D. Oregon.
May 26, 1939.*

Supplemental Opinion Aug. 9, 1939.

* The opinion in this case was filed in preliminary form without annotations on May 26, 1939. The cases considered at the trial have now, September 20, 1940, been added with notes, as well as certain decisions since rendered, which bear on the points involved. Where cases have been decided since the trial, an effort has been made to show the dates of decision. The changes from the text of the preliminary opinion are minor.

Jay Bowerman and C. W. Pecore, both of Portland, Or., for plaintiff.

Ben Anderson, of Portland, Or., for defendants.

McCOLLOCH, District Judge.

This is an injunction action. Treble damages are also claimed.

Plaintiff has (or has had recently) receiving, packing, canning and processing plants and equipment, including floating equipment, in Oregon, Washington, California and Alaska. Plaintiff does no fishing itself. It cans and processes sixty per cent. of the pack of salmon and other marine products put up in Oregon. Since the appearance of albacore tuna off the Oregon coast in recent years, plaintiff has prepared to pack that fish in commercial quantities. To that end, it has expended a large sum for additional plant and equipment at Astoria, Oregon.

The defendant union is an affiliate of the Congress of Industrial Organizations. Its membership includes 90% of the commercial troll fishermen, fishing off shore in Oregon and Washington. The union has a large additional membership among fishermen who fish in the rivers and bays of Oregon and Washington, not including the Columbia River. Union counsel stated at the argument that the defendant did not now claim jurisdiction over California and Alaska waters, but the evidence showed that quite recently defendant had asserted jurisdiction over fishermen in California and Alaska.

This controversy is over the requirement which defendant union imposes on all packers and canners contracting with it, that those contracting will not buy fish from any one not a member of the union. The union's constitution and by-laws obligate union members not to sell fish to packers or canners not under contract with the union. The record, I think, shows that all the packers and canners in Oregon, other than plaintiff, are under contract with defendant at the present time.

Towards the end of last year's fishing season (1938), certain fishermen, residents of the State of Washington, not members of the defendant union, offered their fish for sale to plaintiff. Plaintiff's officials informed the Washington fishermen that plaintiff could not buy from them because of the said "exclusive clause" in the contract which plaintiff then had with the union, whereupon the Washington fishermen threatened plaintiff with criminal prosecution and civil suits under the Federal Anti-Trust Laws. Caught between two fires—the demand of the union that it renew the exclusive buying clause of the union contract, and the threat of the independent fishermen to claim damages from plaintiff if it does renew the exclusive buying clause—plaintiff has now begun this proceeding at the opening of the 1939 fishing season for the adjudication of the legality of the exclusive buying clause in defendant's contracts.[1]

Plaintiff asks for an injunction restraining defendant from interfering with purchases of fish by plaintiff from any source, for a judgment invalidating such portion of the contracts between defendant and other packers and canners of fish, whereby the packers and canners agree not to buy fish from others than defendant's members, and whereby the defendant agrees for its members that they will not sell fish to any packers and canners not having exclusive contracts with it. Plaintiff also asks for damages caused by defendants' interference with pending contracts for the 1939 season, and that these damages be trebled, as provided in the Anti-Trust Laws. 15 U. S.C.A. § 1 et seq.

Before beginning the suit, plaintiff offered to negotiate with defendant, in accordance with past practice, for a price to be paid on the season's catch, but refused to sign a contract containing the exclusive buying clause. Thereupon, defendant's members were notified by the union's officers not to sell fish to plaintiff. This suit was then filed.

Plaintiff asserts that it cannot obtain the fish it needs to supply its customers throughout the United States and in other countries, if it is limited to the catch of fishermen not members of the union.[2] Defendant charges that plaintiff's motive in

---

[1] The union had put the plaintiff under heavy pressure during prior seasons by threatening to cut off its supplies of fish from independent fishermen. Through boycotting, the union had made it impossible for independent fishermen to buy supplies in the port of Marshfield, Oregon, and by similar pressure, had forced the plaintiff to close down its receiving plant at Crescent City, California. Subjected to this pressure, plaintiff had, during the season of 1938, contracted with the defendant union not to buy fish from others than union members.

That plaintiff had so contracted in a former year can make no difference in determining the validity of the contract for later years, for as said in Paramount Famous Lasky Corporation et al. v. United States, 1930, 282 U.S. 30, 44, 51 S.

Ct. 42, 45, 75 L.Ed. 145: "The interest of the public in the preservation of competition is the primary consideration."

[2] The value of the salmon pack for Alaska, Puget Sound and the Columbia River for 1938 was about $42,000,000. Pacific Fisherman, Year-book, 1939, Vol. 37, No. 2, January, 1939. The tuna industry is new in the Northwest. Tuna were found in commercial quantities in Oregon offshore waters in 1937. The business of packing and canning of tuna has expanded rapidly. Plaintiff has expended large sums in constructing special facilities for the canning of tuna. The Oregon tuna is rated a better food fish than the tuna caught in more southerly waters, and tuna canning promises to develop into a large industry.

bringing this suit is to destroy the union, particularly that plaintiff is seeking to obtain this season's and later catches of the recently discovered run of albacore tuna off the Oregon coast at a lower price than it would have to pay if under exclusive contract with defendant.

### The Norris-La Guardia Act.

Defendant claims that this is a "labor dispute", and that the Norris-La Guardia Act, 29 U.S.C.A. § 101 et seq., which prohibits injunctions in labor disputes (except in cases involving fraud or violence), should apply. No fraud or violence is charged by plaintiff.

Plaintiff contends that the relation of employer-employee does not obtain between it and defendant's members, and for that reason disputes the application of the Norris-La Guardia Act. Plaintiff claims that defendant's members are free to fish as and when they please, and that it has no control over defendant's members or their operations in any of the respects which usually characterize the relation of employer and employee. Plaintiff's complaint characterizes the fishermen as "independent contractors". At the trial, plaintiff suggested that it was more apt to describe the fishermen as "merchants", a characterization used by Judge H. K. Zimmerman of the Oregon State Circuit Court in a case between the same parties and involving the same questions, heard by him several years ago.

The union's brief refers to the union as a "trade association", and defendant union relies for further justification of its challenged practices on the provisions of the Act of Congress of June 25, 1934, 15 U.S.C.A. § 521, authorizing fishermen to market collectively. This Act contains a provision that the Secretary of Agriculture may order organizations of fishermen which market collectively, to cease and desist any operations which the Secretary has reason to believe restrain trade to the extent of unduly enhancing prices. The Act provides for injunctive proceedings by the Department of Justice, in the event that such orders by the Secretary are not observed. Defendant urged at the trial that this procedure is exclusive in any case where a monopolistic practice has sprung up, but the Supreme Court has lately rejected a similar contention in interpreting the Capper-Volstead Act, 7 U.S.C.A. § 291, after which the Fishermen's Collective Marketing Act was copied. United States

v. Borden Company et al., 1939, 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181.

Defendant also denies that the case involves interstate commerce.

### Labor Dispute Not Involved.

Passing without comment the inconsistency in defendants' position that the case presents on the one hand a labor dispute involving the relation of employer and employee, within the meaning of the Norris-La Guardia Act, and on the other hand that it presents a question of cooperative marketing by independent producers within the meaning of the Fishermen's Collective Marketing Act, I deal first with the contention that a labor dispute is involved. Defendant calls attention to (a) of Section 13 of the Norris-La Guardia Act, 29 U.S.C.A. § 113(a), reading as follows: "(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein, * * *." But (c) of the same Section must also be considered. It reads: "(c) The term 'labor dispute' includes any controversy concerning *terms or conditions of employment*, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange *terms or conditions of employment*, regardless of whether or not the disputants stand in the proximate relation of employer and employee." (Italicizing added.)

"Terms or conditions of employment" within the meaning of the Act are not, in my opinion, involved in this controversy. Plaintiff refers to defendants as "independent contractors", but defendant union has more aptly described itself in claiming the benefits of the Fishermen's Collective Marketing Act. It is truly a cooperative marketing association, and we look to the law of cooperative marketing rather than to labor law in the determination of the legality of defendants' acts.

Defendant's members are producers, just as cattlemen, grain growers, poultry raisers and orchardists, are producers. Could it be maintained that a cooperative association of any of the types of producers named, having substantial control of production in their given field, could require of all buyers that they agree not to buy from any other producers, and could forbid and prevent their members by fines and other dis-

ciplinary measures from selling to buyers who did not thus agree to buy only from members of the cooperative? Research by counsel during the week's trial and my own research has not disclosed so extreme a claim by any cooperative marketing association in the long history of cooperatives.[3]

While the point was not pressed at the argument, I ask this question in behalf of the consuming public, whose interests are paramount in determining any controversy arising under the Anti-Trust Laws (Paramount Famous Lasky Corporation et al. v. United States, 1930, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145): In any year when defendant's members did not "choose to fish", how would the consuming public get its needs of salmon, tuna and other marine products from North Pacific waters? Since the union's contract does not guarantee a supply of fish, where would the canneries get fish, having agreed to look to the union for their sole supply? Surely reasonable men will agree that the public's interest in an important item of food supply should not be put in such jeopardy. If an exclusive and monopolistic arrangement, as here insisted upon, can be legally made as to fish, it can be made as to milk, as to meat, and as to other necessities of life.[4]

---

[3] Recent cases dealing with legal phases of the production and marketing of food stuffs are Nebbia v. People of State of New York, 1934, 291 U.S. 502, 54 S. Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; United States v. Rock Royal Co-operative, Inc., et al., June 5, 1939, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446, and H. P. Hood & Sons, Inc., et al., v. United States et al., 307 U.S. 588, 59 S.Ct. 1019, 83 L.Ed. 1478, decided the same day. And see a comprehensive recent opinion by Justice Hall S. Lusk upholding the Oregon Milk Control Act. Savage et al. and Fox v. Martin et al., June 6, 1939, 161 Or. 660, 91 P.2d 273.

The distinction must be maintained between acts in combination by producers when under governmental supervision (state or national), and the same acts when done without legislative authority.

Commendable as the motives professed by the defendant union's officers in the present case are—to obtain a monopoly of the catch of salmon and tuna, in the interest of conservation of these important food fishes, such action (unauthorized by legislation and uncontrolled by proper authority) amounted to the defendants' "taking the law into their own hands".

Compare the words of Mr. Justice Douglas in note 60 at page 227 of 310 U.S., at page 846 of 60 S.Ct., in the recently decided case of United States v. Socony-Vacuum Oil Co., Inc., et al., May 6, 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129: "* * * the typical method adopted by Congress when it has lifted the ban of the Sherman Act is the scrutiny and approval of designated public representatives. * * *" (Italicizing added.)

Tigner v. Texas, May 6, 1940, 310 U. S. 141, 60 S.Ct. 879, 84 L.Ed. 1124, opinion by Mr. Justice Frankfurter, is a recent case showing how far the legislature may go in exempting producers of food stuffs wholly or in part from anti-trust statutes. The cited case upheld an old Texas anti-trust statute which exempted farmers and cattlemen under certain circumstances from the criminal penalties of the act. Connolly v. Union Sewer Pipe Co., 1902, 184 U.S. 540, 22 S.Ct. 431, 46 L.Ed. 679, an early case, holding to the contrary as to a similar Illinois statute, was overruled. In this connection, see the dissenting opinion by Justice Brandeis in Frost v. Corporation Commission of Oklahoma et al., 1929, 278 U.S. 515, at 528, 49 S.Ct. 235, at 240, 73 L.Ed. 483.

An excellent general discussion is to be found in "The Law of Cooperative Marketing" published by Evans and Stokdyk in 1937. See particularly Chapter 4, "The Marketing Contract", beginning at page 89. See also Document No. 1106 of the Department of Agriculture "Legal Phases of Cooperative Associations".

The text by Hanna "The Law of Cooperative Marketing Associations", cited by Mr. Justice Frankfurter in the notes to Tigner v. Texas, supra, is not available to the writer.

[4] In United States v. Borden Company et al., 308 U.S. 188, 60 S.Ct. 182, 84 L. Ed. 181, decided December 4, 1939, the contention by a combination of milk producers, that the Capper-Volstead Act, 7 U.S.C.A. § 291, provided an exclusive remedy for monopolistic practices in the field of dairying, was rejected. An indictment, charging combination and conspiracy by the Pure Milk Association, a cooperative association of milk producers, incorporated in Illinois, to control the Chicago market of fluid milk in combination with distributors and others, was upheld, and the contention "that the Pure Milk Association, as an agricultural cooperative association, its officers and agents, (were) exempt from prosecution under Section one of the Sherman Act"

█ Defendant likens its claim to the closed shop in industry, but I cannot concede an analogy. The special and peculiar economic problems growing out of the true relation of employer and employee which have caused sanction to be given by modern decisions and legislation to the closed shop in industry, do not, in my opinion, furnish precedent for a monopoly in the taking and distribution of an important natural food stuff, the common bounty of all men.[5]

## Restraint of Trade and Interstate Commerce [6]

█ Plaintiff distributes its product widely throughout the United States and abroad, and since defendants' acts are directly intended, and will, if carried out, have the effect of denying plaintiff the

---

(308 U.S. at page 191 of the opinion, 60 S.Ct. at page 185, 84 L.Ed. 181) was rejected.

This decision would seem to be conclusive of all the questions presented in the instant case, particularly on the questions of interstate commerce, and as to what constitutes unlawful restraint of trade in the field of food production.

In the Borden case "The trade and commerce alleged to be involved [was] the transportation to the Chicago market of fluid milk produced on dairy farms in Illinois, Indiana, Michigan and Wisconsin and the distribution of the milk in that market" (308 U.S. at page 191 of the opinion, 60 S.Ct. at page 185, 84 L. Ed. 181); while in the case at hand part of the trade and commerce involved is the transportation of fresh fish from plaintiff's receiving stations in California and Washington to its major packing plant at Astoria in Oregon, and the transportation of canned fish from its floating canneries in Alaska to its warehouses at Astoria.

It was asserted at the trial of the instant case that interference with the transportation of fish caught in the waters off the shores of Oregon, Washington and California beyond the three mile limit was not foreign commerce within the meaning of the Sherman Act. It was said that fish caught were not "imports", State v. Jutstrom Fish Co., Inc., et al., 149 Or. 362, 39 P.2d 355; State v. Winegar, 157 Or. 220, 69 P.2d 1057; but it was held in The Abby Dodge v. United States, 1912, 223 U.S. 166, 32 S.Ct. 310, 56 L.Ed. 390, that sponges taken from the waters of the Gulf of Mexico beyond the three mile limit and transported to a port in Florida were foreign commerce.

5 *The ideological foundation of American trade unions distinguishes between those who work for wages or salaries and independent producers or those who are self-employed, and the entire labor movement has been built on that distinction.* Labor Unions in the United States, 16 Encyclopedia Americana (1939) 609.

Employees within the meaning of the Norris-La Guardia Act are wage or salary earners, not independent producers.

Frankfurter & Greene, "The Labor Injunction", chap 4, passim.

The distinguished co-author of "The Labor Injunction", now Justice of the Supreme Court, was one of the draftsmen, it is thought, of the Norris-La Guardia Act. P. 226 of F. & G., note 61.

Even so advanced a decision as New Negro Alliance v. Sanitary Grocery Co., 1938, 303 U.S. 552, 58 S.Ct. 703, 706, 82 L.Ed. 1012, refers continually to "employment" and "terms and conditions of employment".

The fishermen in this case were not employed by plaintiff in the sense of employment as meant by the Norris-La Guardia Act. Their time was their own, many of them following other occupations out of fishing season. Some were farmers, many did not fish regularly, but only when the prices and run were satisfactory. All provided their own boats and gear, either as owners or lessees, the value of the boats and gear running from one hundred dollars to fifteen thousand dollars. Some owning the larger and more valuable boats were themselves employers, hiring others to fish for them.

6 Recent decisions by the Supreme Court construing and applying the Anti-Trust laws are: Ethyl Gasoline Corporation et al. v. United States, March 25, 1940, 309 U.S. 436, 60 S.Ct. 618, 84 L. Ed. 852, imposing limitations on price maintenance through patent monopoly, opinion by Mr. Justice Stone; United States v. Socony Vacuum Oil Co., 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129, holding that price control of a commodity moving in interstate commerce is unlawful per se, opinion by Mr. Justice Douglas; Apex Hosiery Co. v. Leader et al., 310 U.S. 469, 60 S.Ct. 982, 1002, 84 L. Ed. 1311, 128 A.L.R. 1044 (May 27, 1940), holding that the nature and effect of restraints on trade determine whether the Sherman Act has been violated; unreasonable restraints in the field of commercial competition were the practices aimed at by the Sherman Law, and that a restraint of trade to be unlawful must, both in purpose and effect be such as to "monopolize the supply, control its price,

needed raw material to carry on its business, I entertain no doubt that the Federal Anti-Trust Laws apply. The movements of fish to plaintiff's canneries across State lines and from territorial and international waters strengthen the conviction that here is a proper case for invocation of the Federal Statutes.[7]

The exclusive buying clause in the union's contract, which forbids plaintiff from buying fish from others than members of the defendant union, and the clauses in the union's constitution and by-laws which forbid union members from selling to plaintiff and to others not contracting with the union on the exclusive terms demanded, are, in my view, in restraint of trade and void. The conduct of the present defendants is condemned by all three counts of the criteria reaffirmed in Apex Hosiery Co. v. Leader et al., 310 U.S. 469, 512, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044 (May 27, 1940), that that restraint to come within the sweep of the statutes is actionable, which both in purpose and effect monopolizes the supply, controls its price, or discriminates between its would-be purchasers.

All three elements are here present. And see Consolidated Terminal Corporation v. Drivers, etc., et al., D.C., 33 F.Supp. 645, 649, 1st col.

I desire to express my appreciation of the candor and reasonableness with which the case has been presented on both sides, and to say also that I deeply sympathize with the earnestness and zeal manifested by the leaders of the defendant union in their struggle for better prices for the fish caught by their members, as well as their great interest in conserving the food supply with which they deal.

Having organized the fishermen ninety per cent., the defendant union has a great power in its hands. Such control, approaching a complete monopoly in the production of one of life's necessities, calls for reasonableness and moderation in the exercise of the power. I am certain that with so complete an organization, the fishermen will find that the powers granted by the Federal cooperative statutes are ample to protect their markets. More power over their markets than exercised by the other producers of the nation in the fields of ag-

---

or discriminate between its would-be purchasers".

The recent District Court case of Consolidated Terminal Corporation v. Drivers, etc., et al., June 26, 1940, 33 F. Supp. 645, discusses the Apex opinion.

[7] Recent decisions seem to indicate that the concept of interstate commerce as defined in the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. is broader than the concept of the Sherman Act. National Labor Relations Board v. Fainblatt et al., 1939, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014; National Labor Relations Board v. Santa Cruz Fruit Packing Co., 9 Cir., 1937, 91 F. 2d 790, affirmed, 1938, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; C. E. Stevens Co. et al. v. Foster & Kleiser Co. et al., 9 Cir., 1940, 109 F.2d 764; Apex Hosiery Co. v. Leader et al., 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044 (May 27, 1940).

Certainly labor relations of the canneries and packing plants of plaintiff which distribute its products throughout the United States and abroad would be under the jurisdiction of the National Labor Relations Board under the cases cited, and it seems equally certain that the shutting off of plaintiff's supply of raw materials through concerted action is an actionable wrong. Compare the language of Mr. Justice Holmes in Aikens v. Wisconsin, 1904, 195 U.S. 194, at page 204, 25 S.Ct. 3, at page 5, 49 L.Ed. 154: "It has been considered that, prima facie, the intentional infliction of temporal damages is a cause of action, which, as a matter of substantive law, whatever may be the form of pleading, requires a justification if the defendant is to escape." And see "Privilege, Malice and Intent", 8 Harv.L.Rev. 1, by Holmes. That such concerted action is a restraint of interstate commerce under the Sherman Act seems equally clear. The following quotation from an analogous case is deemed pertinent: " * * * commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business. When cattle are sent for sale from a place in one state, with the expectation that they will end their transit, after purchase, in another, and when in effect they do so, with only the interruption necessary to find a purchaser at the stock yards, and when this is a typical, constantly recurring course, the current thus existing is a current of commerce among the states, and the purchase of the cattle is a part and incident of such commerce. What we say is true at least of such a purchase by residents in another state from that of the seller and of the cattle." Swift & Company v. United States, 1905, 196 U.S. 375 at 398, 25 S.Ct. 276, 280, 49 L.Ed. 518.

riculture, horticulture and the raising of livestock the fishermen of the North Pacific, whose interests defendant represents, cannot expect and should not demand.

Injunction granted.[8]

## Supplemental Opinion
### Damages Under the Sherman Act
### Effect of the New Rules

■ The remaining question undisposed of on the motion for new trial is whether damages can properly be claimed and allowed in a suit for an injunction under the Anti-Trust Laws. The authorities, prior to the new Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, held that damages might only be claimed in a separate law action. Fleitmann v. Welsbach Street Lighting Co., 1916, 240 U.S. 27, 36 S.Ct. 233, 67 L.Ed. 505; Decorative Stone Co. v. Building Trades Council of Westchester County, 2 Cir., 1928, 23 F.2d 426, certiorari denied, 277 U.S. 594, 48 S.Ct. 530, 72 L.Ed. 1005.

Have the New Rules changed this rule as to damages?

I believe they have.

Rule No. 2 reads as follows: "There shall be one form of action to be known as 'civil action.'"

In Note 2 to the above rule we learn: "Reference to actions at law or suits in equity in all statutes should now be treated as referring to the civil action prescribed in these rules."

Rule 18 provides as follows:

"(a) The plaintiff in his complaint or in a reply setting forth a counterclaim and the defendant in an answer setting forth a counterclaim may join either as independent or as alternate claims as many claims either legal or equitable or both as he may have against an opposing party. * * *

"(b) Whenever a claim is one heretofore cognizable only after another claim has been prosecuted to a conclusion, the two claims may be joined in a single action; but the court shall grant relief in that action only in accordance with the relative substantive rights of the parties. In particular, a plaintiff may state a claim for money and a claim to have set aside a conveyance fraudulent as to him, without first having obtained a judgment establishing the claim for money."

Rule 20 and Forms 12, 13, 16 and 17, following the Rules, 28 U.S.C.A. following section 723c, also have a bearing on the question.

Whether a defendant in an injunction suit under the Anti-Trust Laws is still entitled to a jury trial on the amount of damages, and whether in such jury trial the question of violation of the Anti-Trust Laws, in addition to the amount of the damages, is to be redetermined by the jury (assuming that the equitable features of the case have first been tried and ruled adversely to the defendant), are different questions.

The present defendants urge that they were not given fair warning by the complaint herein that damages, as well as injunctive relief, were to be claimed—if they had had notice that damages were to be claimed, they would have made timely demand for jury trial. On the other hand, plaintiff contends that jury trial was waived by failure to make timely demand.

The prayer of the complaint as to damages is as follows: "For a decree ascertaining the damages suffered by plaintiff by reason of the unlawful acts of the defendants herein complained of, and awarding judgment in favor of the plaintiff and against the defendants, and each of them, for thrice the amount of said damages."

The body of the complaint contained no allegation of damage prior to the commencement of the action. The sole allegation as to damage is contained in paragraph XVI, which reads: "That if a restraining order is granted, no damage will ensue to the defendants, nor to any fisherman, whereas if a restraining order is not granted, the plaintiff will suffer a daily damage

---

[8] The judgment was declaratory in its nature in the respects that it adjudged the form of contract, which defendants were demanding of plaintiff as a condition to selling it any fish, to be illegal, and that such contracts previously entered into by defendants with others were illegal. The coercive part of the judgment enjoined defendants from interfering with plaintiff's property and business in carrying out or attempting to carry out the conspiracy which was found to exist. The judgment further enjoined the carrying out of contracts entered into by defendants with others as part of the combination and conspiracy by defendants to control the catch of salmon, tuna and other marine products in Alaska, Oregon, Washington and Northern California waters.

(excluding Sundays) continuing through-out the 1939 fishing season, in the aggregate amount of $20,000, and unless restrained by an order of this court the defendants will continue their said unlawful conduct, and cause the plaintiff to suffer said damage."

Defendants did not object to the testimony offered by plaintiff of damages occurring prior to the action, but, at the argument of the cause, objected to any claim for damages, on the ground that they had not been pleaded, defendants' counsel stating that if they had been advised by plaintiff's pleading that damages for prior acts would be claimed, defendants would have demanded a jury trial.

Plaintiff thereupon offered an appropriate amendment to its complaint to accord with the proof of damages made at the trial. Decision was reserved on the amendment, and the amendment allowed on the date the judgment, which was favorable to plaintiff, was entered.

Plaintiff contends that defendants have waived their right to jury trial by failing to demand it earlier, but I take the view, first, that the complaint prior to amendment was not adequate to advise the defendants that damages for prior acts would be claimed; and, second, that my ruling on the date when judgment was entered for plaintiff, allowing the amendment to the complaint, to include the allegations of prior damage, was the first time that the defendants had fair notice that damages were claimed and might be allowed, and was the first time defendants were under compulsion by the terms of Rule 38 of the New Rules to demand a jury trial. By that Rule defendants were given ten days in which to make such demand. They were deprived of this right by the immediate entry of the judgment. It follows that the portion of the judgment awarding treble damages should be and it is hereby stricken.

The other portions of defendants' motion (as indicated at the last hearing) will be denied.[9]

---

[9] After the judgment had been entered, defendants' attorney asked leave to withdraw certain proposed conclusions of law, and to strike the reference to defendants' proposals from the conclusions adopted and filed.

By the express provisions of the New Rules, a defeated litigant need not request findings of fact in order to question the sufficiency of the findings on appeal, and findings may be amended on motion made not later than ten days after entry of judgment. Rule 52(b). Nothing is said in the Rules about amending conclusions of law, or about withdrawal of requested conclusions.

An affidavit filed by defendants' attorney stated that he had proposed the conclusions in question through inadvertence, and it was strongly urged that I should permit the proposed conclusions to be withdrawn from the files. I stated that it was for the appellate court to determine the effect, if any, to be given to defendants' request, even though made in error, and that I was unwilling to make any change in the record after final judgment. I have not changed my mind about this. Some of the difficulties arising from altering or amending a record after final judgment are disclosed in the following cases, all decided under the New Rules: Charles C. Hayes v. Edward W. Kelley et ux., 9 Cir., June 13, 1940, 112 F.2d 897, considering but not passing on the propriety of amending findings after notice of appeal. Vigorous dissenting opinion by Judge Haney hold-ing that findings could not be thus amended, and that this question was presented for decision in the case. Rules 52 and 59 of Federal Rules of Civil Procedure considered. Harry W. Reinstine v. William M. Rosenfield et al., 7 Cir., May 8, 1940, 111 F.2d 892, holding that findings and conclusions may be entered after judgment. Judgment of Dismissal May 1, 1939. Appeal taken the same day. Findings and conclusions made by the court sua sponte September 25, 1939. Great Lakes Casualty Co. v. Peano et al., D.C.Or., 1 F.R.D. 244, April 5, 1940, holding that findings may be amended after judgment, unless amendments are of such nature as to call for setting aside or modification of judgment. Sonken-Galamba Corporation et al. v. Atchison, Topeka & Santa Fe Railway Company et al., D.C., 34 F.Supp. 15, declining to make additional findings after judgment on motion of losing party. Charles W. Miller v. United States, 7 Cir., 114 F.2d 267, holding that a district court has not authority to vacate its judgment after an appeal has been taken.

If Rule 52 is relied upon for withdrawal of the proposed conclusions, and amendment of the conclusions as made and adopted, the defendants' motion was not filed in time. Judgment was entered herein on June 14, 1939, and defendants' petition to withdraw and for amendment was filed on August 31st. As stated above, Rule 52 requires that a motion to amend findings shall be filed not later than ten days after entry of judgment.