**OGDEN DAIRY CO. v. WICKARD, Secretary of Agriculture, et al.**

**No. 8980.**

Circuit Court of Appeals, Seventh Circuit.
Oct. 21, 1946.

J. H. Silver, of Chicago, Ill. (Leon A. Semerak, of Chicago, Ill., of counsel), for appellant.

Wendell Berge, Asst. Atty. Gen., James A. Doyle, Sp. Asst. to Atty. Gen., Karl R. Price, Atty., Department of Agriculture, of Washington, D. C., J. Albert Woll, U. S. Atty., of Chicago, Ill., J. Stephen Doyle, Jr., Sp. Asst. to Atty. Gen., and John P. Lulinski, Asst. U. S. Atty., of Chicago, Ill., for appellees.

Before SPARKS and MINTON, Circuit Judges, and BRIGGLE, District Judge.

BRIGGLE, District Judge.

This proceeding challenges an order by the War Food Administrator directing plaintiff (appellant here) to pay to the Pure Milk Association the sum of $11,483.71. The District Court sustained the order. The administrator rests his authority for such order upon the provisions of the Agricultural Marketing Agreement Act of 1937, 7 U.S.C.A. § 601 et seq., supplemented by Administrative Order No. 41 Chicago Marketing Area, some of the pertinent provisions of which are set forth in a footnote.[1]

---

[1] Section 941.4(d) provides: "For each delivery period each handler shall compute, in the manner and on forms prescribed by the market administrator the amount of milk in each class, * * * as follows:

"(1) Determine the total pounds of milk (a) received from producers, (b) produced by him, if any, (c) received from other handlers, if any, (d) received from other sources, if any and (e) add together the resulting amounts.

\*     \*     \*     \*     \*

"(3) Determine the total pounds of milk in Class I as follows: (a) convert to quarts the quantity of milk disposed of in the form of milk, except such milk as is used for purposes for which no approval by health authorities in the marketing area is necessary, and multiply

The administrator has undertaken to set up a system, the complexities of which are immediately apparent, calculated to encourage the production and distribution of milk regardless of the use to which it is put after it leaves the producer. It is sufficient in the disposition of this matter that we keep sight of the fact that the fundamental and controlling factor is the butterfat content of the milk regardless of whether the processor sold the same as fluid milk or whether it was used in the manufacture of cheese or butter, or put to other uses. The return to each producer is expected to be equalized according to the butterfat content of his milk.

Plaintiff is known as a handler and operates a large plant in the City of Chicago where the milk is received, pasteurized and otherwise processed for the trade. During the period here in question—July, 1940, to March, 1942—plaintiff had four storage tanks of 5000, 4000, 3000, and 1700 gallons capacity respectively where the incoming milk was received and stored. Plaintiff received milk principally from three sources and stored it separately in the respective tanks and processed it separately without standardization. The milk in some tanks would, therefore, necessarily have a greater butterfat content than others, and plaintiff's product would not be uniform in butterfat content. During the period in question plaintiff followed the practice of making tests for butterfat from each 1000 gallons flow as the milk passed from each tank to the pasteurizer and computed an average butterfat content of all milk processed for the day. These figures were transferred to a book at the close of the day or on the following day and the original memoranda destroyed. These daily averages of butterfat utilization so transferred to the so-called permanent record were used as the basis for plaintiff's reports during each marketing period on the forms furnished and prescribed by the Market Administrator. These reports, if accurate, would reflect whether plaintiff for the period in question was in the plus or minus column with respect to the utilization of butterfat.

During the same period the Market Administrator engaged in various tests for butterfat content of plaintiff's milk. During that portion of the period from July, 1940, to April, 1941, the administrator carried on what is referred to as spot testing. He took samples largely from plaintiff's icebox but occasionally obtained them

---

by 2.15, (b) multiply the result by the average butterfat test of such milk, and (c) if the quantity of butterfat so computed when added to the pounds of butterfat in Class II milk, Class III milk, and Class IV milk, computed pursuant to subparagraphs (4) (b), (5) (b), and (6) (c) of this paragraph is less than the total pounds of butterfat received, computed in accordance with subparagraphs (2) of this paragraph, and amount equal to the difference shall be divided by 3.5 per cent and added to the quantity of milk determined pursuant to (a) of this subparagraph."

Section 941.5 (a) (1). "* * * Any handler who purchases or receives, during any delivery period, milk from a cooperative association which is also a handler shall, on or before the 15th day after the end of the delivery period, pay such cooperative association in full for such milk at not less than the minimum class prices, with appropriate differentials, applicable pursuant to this section."

Section 941.5 (c) provides that if any handler has purchased milk containing more or less than 3.5 percent butterfat, such handler shall add to or deduct from the price as otherwise fixed an amount which is proportionate to the difference in butterfat content.

Section 941.3(b) provides: "The market administrator shall verify all reports and payments of each handler by audit of such handler's records, and of the records of any other handler or person upon whose disposition of milk such handler claims classification. Each handler shall keep adequate records of receipts and utilization of milk and shall, during the usual hours of business, make available to the market administrator or his representative such records and facilities as will enable the Market Administrator to:

"(1) Verify the receipts and disposition of all milk required to be reported pursuant to this section, and in case of errors or omissions, ascertain the correct figures:

"(2) Weigh, sample, and test for butterfat content the milk received from producers and any produce of milk upon which classification depends and

"(3) Verify the payments to producers prescribed in Sec. 941.8."

from plaintiff's vendors, all without regard to what tank the milk came from. Later and during the period from April, 1941, to March, 1942, the Administrator changed his method of sampling by conforming largely to that used by plaintiff. The average result reached by the administrator over the entire period in question varied from that reached and reported by plaintiff to the extent that the administrator determined that plaintiff's indebtedness for such period was $11,483.71. This figure represented the difference between what plaintiff reported and the average result of the tests conducted by the administrator and it was ordered by the administrator that plaintiff pay this sum to the Pure Milk Association. Plaintiff sought review of this determination before the administrative body and later before the District Court.

■ Our examination of the question is limited to a determination of whether there was substantial evidence to support the order of the administrative tribunal. Republic Aviation Corporation v. National Labor Relations Board, 324 U.S. 793, 800, 65 S.Ct. 982, 89 L.Ed. 1372, 157 A.L.R. 1081; Dobson v. Commissioner, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248.

It is quite obvious that either the method employed by plaintiff or that employed by the administrator rested upon the law of averages. It was neither feasible nor possible to test every gallon of milk or even every hundred gallons, but the butterfat content was to be judged by a fair and adequate sampling of the product. It would seem that the method employed by plaintiff was in some respects superior to that originally employed by the administrator—indeed, the administrator must have thought so as he later, during the period in question, adopted much the same method. But it is not the plaintiff's method of testing that is so much criticized by the administrator as its method of transcribing and preserving records of its tests. The administrator charges that plaintiff has so manipulated its records as to cause them to incorrectly reflect the true butterfat tests made by it.

■ The record before the administrative tribunal was voluminous in support of the reliability of the respective butterfat tests. It would serve no good purpose to recite the substance of such testimony or the respective contentions in relation thereto. It is sufficient to observe that an impartial trier of the facts could have adopted either series of tests as reflecting the truth. Plaintiff is insistent in its assertion that the administrator's system of spot sampling was inadequate and unfair and that its own was the only adequate method of determining the overall butterfat content of plaintiff's product, yet facts and circumstances appear from plaintiff's own witnesses in connection with the destruction of the original records of butterfat tests that could well have caused the trier of the facts to look askance at plaintiff's records that were preserved for the purpose of reports to the administrator. Color is lent also to the view of the administrator by testimony that promises were made by plaintiff to preserve such records for use of the administrator, which apparently was not done. One of plaintiff's testers admitted that he consistently avoided sampling when the lower-test milk was coming off the filler. These circumstances and others could well have caused the hearing officer to have branded plaintiff's tests and records with a degree of unreliability.

■ Our duties have been so circumscribed that we are without authority to appraise the value of the evidence or consider the credibility of the witnesses. A study of the record made before the hearing officer leaves us unable to say that there was not substantial evidence to support the conclusion reached by the administrator. Other errors raised on the record are without substantial merit and the decree of the District Court is

Affirmed.