WILLOW FARMS DAIRY, INC.

v.

Orville L. FREEMAN, Secretary of Agriculture.

Howeth M. MILLS and Crawford Mills, individually and as co-partners, d/b/a Mills Dairy Products Company, a co-partnership, Nesbitt C. Murphy, an individual, d/b/a Shiloh Dairy Farms, and Bruce G. Twilley, an individual d/b/a Twilley's City Dairy

v.

Orville L. FREEMAN, Secretary of Agriculture.

Civ. Nos. 13305, 13147.

United States District Court
D. Maryland.
June 13, 1962.

———◆———

Charles G. Page, Baltimore, Md., for Willow Farms Dairy, Inc.

James K. Knudson, Ben Ivan Melnicoff, Washington, D. C., Robert F. Skutch, Jr., and Weinberg & Green, Baltimore, Md., for Howeth M. Mills and others.

Joseph D. Tydings, U. S. Atty., Baltimore, Md., and Donald B. MacGuineas and Irwin Goldbloom, Attys., Dept. of Justice, and Joseph A. Walsh, Atty., Dept. of Agriculture, Washington, D. C., for defendant.

THOMSEN, Chief Judge.

This opinion deals with two statutory actions brought under sec. 8c(15) (B) of the Agricultural Adjustment Act (1933), as reenacted and amended by the Agricultural Marketing Agreement Act of 1937 and subsequent amendments (the Act), 7 U.S.C.A. § 601 et seq. All future references herein will be to sections of Title 7 U.S.C.A., unless otherwise indicated.

The complaints seek review of two rulings made by a Judicial Officer of the Department of Agriculture, acting for the Secretary of Agriculture (Secretary) [1], on petitions filed by plaintiffs under 608c(15) (A) [2], challenging the valid-

1. Reported in 20 A.D. 810 and 20 A.D. 541 respectively. The Judicial Officer acted as and for the Secretary, pursuant to authority duly delegated (10 F.R. 13769) under the Act of April 4, 1940, 5 U.S.C.A. § 516a et seq. (11 F.R. 177 A–233, 18 F.R. 3219, 3648 and 19 F.R. 74).

2. The provisions of 608c(15) (A) and (B) are set out in n. 1 to the opinion of this court in Willow Farms Dairy, Inc. v. Benson, 181 F.Supp. 798, aff'd 4 Cir., 276 F.2d 856. That opinion, a later opinion in the same case, 181 F.Supp. 802, and the two opinions in United States v. Mills, 185 F.Supp. 709 and 187 F.Supp.

ity of Order No. 127, Regulating the Handling of Milk in the Upper Chesapeake Bay Marketing Area, 7 C.F.R. sec. 1016 (rev. 1962), 24 F.R. 11071. See also 24 F.R. 9441 and 9456.

Plaintiff in one action, Willow Farms Dairy, Inc. (Willow Farms), is a "handler" as referred to in 608c(1) and as defined in the Order,[3] located in Carroll County, Maryland, a rural county northwest of Baltimore. Plaintiffs in the other action, Mills et al., are three separate handlers located in Dorchester County, on the Eastern Shore of Maryland. The term "plaintiffs" will be used to refer to plaintiffs in both cases collectively.

### The Issues

Willow Farms contended in the 608c (15) (A) proceeding and contends here that Order No. 127 (the Order) is invalid in its entirety because the Secretary failed to comply with certain statutory prerequisites relating (A) to the determination of parity prices and (B) to

producer approval; (C) that the pooling of County handlers with Baltimore City handlers is arbitrary and illegal; and (D) that other provisions of the Order establish prices which are not uniform as to all handlers, in violation of 608c (5), including a provision for "compensatory payments" similar to the provision recently held invalid by the Supreme Court in Lehigh Valley Coop. Farmers, Inc. et al. v. United States et al. (June 4, 1962), 82 S.Ct. 1168.

In their original petition in the 608c (15) (A) proceeding Mills et al. raised the point that the Secretary did not make findings of facts as to prices, but their principal contention was that including eight Eastern Shore Counties in the marketing area [4] was not in accordance with law because not supported by evidence in the promulgation record, and that they should have been allowed to offer additional evidence in the 608c(15) (A) proceeding to support their contention that the Eastern Shore counties should not have been included.[5] In this 608c(15)

314, discuss plaintiffs' earlier efforts to secure a review of the Order.

3. 608c(1) provides: "The Secretary of Agriculture shall, subject to the provisions of this section, issue, and from time to time amend, orders applicable to processors, associations of producers, and others engaged in the handling of any agricultural commodity or product thereof specified in subsection (2) of this section. Such persons are referred to in sections 601–608, 608a, 608b, 608c, 608d–612, 613, 614–619, 620, 623, and 624 of this title as 'handlers'. * * *"

Sec. 1029.2(g) of the Order states: "'Handlers' means any person (1) in his capacity as the operator of a pool plant; (2) in his capacity as the operator of a nonpool plant from which (i) Class I is disposed of on routes in the marketing area; or (ii) milk is shipped to a pool plant qualified pursuant to sec. 1027.3(b) (1); and (3) a cooperative association with respect to the milk of any producer which it causes to be diverted in accordance with the provisions of paragraph (e) of this section from a pool plant for the account of such cooperative association." Plaintiff's plant is a "pool plant" within the meaning of the order, i. e. milk received at the plant is classified, priced and pooled under the order.

4. Sec. 1027.1(c) of the Order states: "'Upper Chesapeake Bay Marketing Area' hereinafter referred to as the 'marketing area' means all territory situated within the corporate limits of the City of Baltimore, the town of Laurel in Prince George's County; the counties of Anne Arundel, Baltimore, Caroline, Carroll, Cecil, Dorchester, Harford, Howard, Kent, Queen Anne's, Somerset, Talbot, Wicomico, Worcester and" a part of Calvert County, all in the State of Maryland. Mills et al. object to the inclusion in the Order of eight out of the nine Eastern Shore Counties, namely: Caroline, Dorchester, Kent, Queen Anne's, Somerset, Talbot, Wicomico and Worcester. Cecil, the northern-most county on the Eastern Shore, presents special problems because of its proximity to Wilmington, Delaware, and both sides are agreed that those problems need not be discussed in this case.

5. After application for preliminary relief was denied, 19 A.D. 1, and the application to dismiss by the government was denied, 19 A.D. 296, a hearing was held in Cambridge, Maryland, in which the hearing examiner ruled that most of petitioners' proffered evidence was inadmissible. On review, these rulings were upheld on the ground that the proffered

(B) proceeding, Mills et al. press these points, and adopt the arguments made by Willow Farms against the validity of the Order as a whole.[6]

### The Act

The principal purposes of the Act, as set out in 602(1) and (2) are "to establish and maintain such orderly marketing conditions for agricultural commodities in interstate commerce as will establish, as the prices to farmers, parity prices * * * " and to protect the interest of the consumer by placing certain limits on the action which the Secretary may take. One of the commodities included in the Act is milk, as to which supplemental criteria are provided in 608c(18), discussed at length in Section A of this opinion under the heading "Parity Prices". The problems with respect to milk at the time the Act was adopted were discussed in United States v. Rock Royal Co-op., 307 U.S. 533, at 548 et seq., 59 S.Ct. 993, at 1001, 83 L.Ed. 1446. In recent years such problems have arisen largely out of an increasing surplus and the competition among farmers (called "producers" in the milk industry) to secure as large a share as possible of the most lucrative market, which is for milk disposed of in the form of "fluid milk" (see note 9 below) as distinguished from milk disposed of for other uses. To alleviate the effects of that competition on producers, the Act authorizes the Secretary—subject to certain limitations and conditions [7] —to promulgate marketing orders based on a system of pooling, intended to yield to each producer in the specified marketing area a uniform price for all milk delivered by him for processing, irrespective of the particular use to which it is ultimately put. 608c(5) (A) and (B) (ii).

A thorough discussion of the operation and effect of such orders is contained in the Report to the Secretary of Agriculture by the Federal Milk Order Study Committee, April 1962, which will be referred to herein as the Report.[8]

### The Order

The Order with which we are concerned was summarized by the Judicial Officer as follows: "Order No. 127 contains such a scheme whereby each handler pays for milk subject to regulation under the order at class values or prices, differing according to the use he makes of such milk, while producers receive a uniform or blend price based upon the total value of all milk used by all handlers under the order. Each handler

---

evidence was beyond the cause of action stated in the amended petition and improper in a review proceeding under 608c (15) (A). See 19 A.D. 807.

Mills et al. also contended in the 608c (15) (A) proceeding that the reporting and record keeping requirements of Order No. 127 are invalid in that such provisions were not promulgated in compliance with the Federal Reports Act of 1942 (5 U.S.C.A. § 139 et seq.). They did not press that point in this 608c(15) (B) proceeding. It is without merit, for the reasons stated in United States v. Mills, 185 F.Supp. 709, at 710.

6. The Secretary contends that Mills et al. are not entitled to rely on any points in this 608c(15) (B) proceeding which they did not raise in the 608c(15) (A) proceeding. It appears, however, from the original petition itself and from the Preliminary Statement in the Tentative Decision and Order of the Judicial Officer (which he adopted as his Final Decision and Order), that Mills et al.

in their original petition in the 608c (15) (A) proceeding did raise the point that the Secretary did not make findings of fact as to prices, which are a "threshold jurisdictional statutory requisite".

7. The limitations and conditions imposed on the Secretary by the Act deal with the policies which must guide his action, the procedure to be followed, the findings to be made, and permissible terms of an order. See 608c(1), (2), (3), (4), (5), (7), (8), (9), (11), (12), (18) and (19). It should be noted that many of these sections have been amended since the Rock Royal decision, but the general pattern of the statute remains the same.

8. Various aspects of such orders were discussed in United States v. Rock Royal Co-op., 307 U.S. at 551, et seq., 59 S.Ct. at 1002; in H. P. Hood & Sons v. United States, 307 U.S. 588, at 593, et seq., 59 S.Ct. 1019, at 1022, 83 L.Ed. 1478; and in Lehigh Valley Co-op Farmers, Inc. v. United States, 82 S.Ct. 1168 et seq.

pays his own producers at the uniform price and then, through adjustments with the producer-settlement fund kept by the market administrator, brings the total he has paid to producers up to (by paying into the producer-settlement fund) or down to (by receiving money from such fund) the total he is required to pay at class prices. In effect, a handler receives from the producer-settlement fund the amount by which the value of his milk at the class price is less than the value at the blend price and pays into the producer-settlement fund the amount by which the value of his milk at the class price exceeds the value at the blend price." [9] 20 A.D. at 816.

### The Record

The procedures under the Act are such that it is very difficult to attack an order of the Secretary with any hope of success. The facts are buried in a voluminous promulgation record, the essential findings are usually made in the language of the statute, and it is hard to overcome the presumption that the Secretary must have done what he was required by law to do. In this instance, however, counsel for Willow Farms has been able to obtain, by discovery in the earlier proceedings, certain admissions as to what the Secretary and his aides did and did not do before the Order was issued. The facts have been marshalled in the complaint filed by Willow Farms in this 608c (15) (B) proceeding. In his answer, the Secretary denied most of those allegations except such as were "borne out by the record in the Section 8c (15) (A) proceeding". However, before the hearing the court required the Secretary to answer the complaint in detail, marking those allegations he disputed, those which he admitted, and those which he did not dispute but considered irrelevant or immaterial. It developed that few of the facts alleged in the complaint were disputed, and most of those disputes were resolved during the oral argument. It has therefore been possible for Willow Farms to show in this proceeding the real basis upon which the Secretary acted, and to overcome the argument that the Secretary must be presumed to have done what he should have done.

The disputed facts in the Mills case have been narrowed in a similar fashion. Most of the material facts are not disputed, although as to some of them the record is quite vague.

### The Plaintiffs, the Cooperative and the Large Baltimore Handlers

Willow Farms has its plant at Frizellburg, Carroll County, 36 miles from Baltimore, where it pasteurizes and bottles milk, produces cottage cheese and buttermilk, and manufactures ice cream. It serves 16 routes in Carroll County, 4 in

9. The classes of utilization are set out in sec. 1027.41 of the Order. Class I included "fluid milk" and certain "fluid milk products". For the purpose of this case it will be clearer to refer to the findings and conclusions made by the Secretary when he first published the proposed order, 24 F.R. 9441, at 9447, where he said:

"Under the proposed classification scheme, Class I milk would be all skim (including any used to produce concentrated milk and reconstituted or fortified skim milk) and butterfat disposed of (other than as sterile products in hermetically sealed containers) in fluid form as milk, flavored milk, skim milk, flavored or cultured skim milk, buttermilk, concentrated milk and 50 percent by weight of the product known as 'half and half' which has a butterfat content of at least 12 percent but less than 18 percent. Skim milk and butterfat not specifically accounted for in Class II also would be classified in Class I.

"All skim milk and butterfat used to produce products other than fluid milk products as set forth above should be Class II. This classification would include all of those products which are generally considered as manufactured milk products not required by the health authorities to be made from milk from approved local sources.

"Fluid cream, although generally considered in its physical form to be a fluid milk product, should be classified in Class II. * * * The inclusion of fluid cream as a Class I product would price cream derived from producer milk at a competitive disadvantage with cream imported from other sources. * * *"

Frederick County and 10 in Baltimore County, only 4 of which enter the suburban area surrounding Baltimore City. It has a plant permit from the State Health Department and is eligible to ship milk anywhere in the State except in Baltimore City.

Willow Farms cannot sell milk in Baltimore City because of the City's health regulations [10], which prohibit the sale of milk in Baltimore from any plant which is not located in the City itself.

Willow Farms buys milk from 37 farmers, who have producer permits issued by the State Health Department. It takes all the milk its farmers produce, and uses 90% thereof as Class I milk (for fluid purposes). Its farmers cooperate to avoid season surpluses; about 92% of their total milk deliveries are base milk, i. e. the amount produced during the short supply season.

The Mills and Twilley dairies are located in Cambridge, the Shiloh Dairy in Hurlock, Dorchester County. They sell only in Dorchester, Caroline and Wicomico Counties, all on the lower Eastern Shore of Maryland. They are small operations, Twilley and Shiloh very small; the three of them buy most of their milk from some 25 farmers located in the area, taking the full production of those farmers. They buy whatever additional milk they need from various sources, some outside the State. Practically all of their milk is sold as fluid milk.

The Maryland Cooperative Milk Producers, Inc. (the Cooperative) had about 1,800 members in 1959. It sold most of its milk to five handlers in Baltimore City, and made spot sales to the other five handlers in Baltimore City, who purchase most of their milk from other producers. In 1959 the Cooperative sold about 75% of the milk sold for consumption in Baltimore City. It sells to its five principal customers at percentage

discounts and tailors its prices to enable those City handlers to compete more readily in the Counties. It does not sell much milk to County handlers; when it does, such milk is sold for what it can get.

The City health regulations require each producer who sells milk for consumption in the City to have a City permit, and do not permit such a permit holder to sell milk to any handler who does not have a plant in the City, under penalty of having his permit revoked. The Cooperative, however, is treated as a handler, and so its members avoid this regulation. It has an interest in a manufacturing plant in Laurel, Prince George's County, and sells milk where it can.

About 50 farmers on the Eastern Shore are members of the Cooperative. Some 35 others sell to Baltimore handlers direct. Most of the Eastern Shore farmers sell to Wilmington, Philadelphia or New York handlers [11], and to the few small handlers on the Shore, such as Mills.

For many years before the passage of the Order, Willow Farms and the three Eastern Shore plaintiffs had been paying their farmers flat prices which were somewhat higher than the average prices which the Cooperative was paying its members for their milk. This was possible because of the high percentage of fluid use by the county dairies.

Apparently, no one knows how many producers sell milk to handlers in the marketing area, regularly or occasionally. Many such producers are located in other states, some holding City permits for milk, some for cream only, and some selling only to County handlers.

There are 10 handlers in Baltimore City, of which the largest is National Dairy Products Corporation, which sells in Maryland as Sealtest Baltimore, Seal-

---

10. See Maryland Code, 1957, Art. 43, sec. 569(f), and Baltimore City Code, 1950, Art. 12, secs. 14–44.

11. The blend prices in the orders controlling the Wilmington, Philadelphia and New York marketing areas are somewhat higher than in Order No. 127, but distance differentials make it difficult to frame a quantitative statement.

test Washington and Sealtest Philadelphia. Four of its plants now serve the marketing area covered by the Order, but National is able to shift its plants from one market to another to suit its purposes. Koontz Creamery, a Baltimore handler, also has plants in Westminster, Carroll County (Western Shore) [12], and in Salisbury, Wicomico County (Eastern Shore), and sells in a number of counties on both sides of the Bay. Its Salisbury plant gets bulk milk and package milk from Baltimore. Aristocrat Dairy is the only other Baltimore handler which sells on the Eastern Shore.[13]

At the time of the passage of the Order over 60% of the milk sold on the Shore went through the Baltimore plants of these three handlers, Sealtest, Koontz and Aristocrat. But more than two-thirds of that amount was represented by milk sold in quantity by Sealtest Baltimore to Clark Brothers, a retailer which serves many of the counties on the Shore. This business was shifted by National from Sealtest Washington to Sealtest Baltimore just before the hearings which led to the Order. No doubt this was done from mixed motives, but it enabled National to argue that more than 50% of the milk sold on the Shore passed through Baltimore, and so persuade the Secretary to include the lower Eastern Shore in the marketing area. National had attempted without success to have those Counties included in the Washington marketing area in the order which was promulgated May 28, 1959.

In connection with that Order the Secretary said: "While one substantial Washington handler distributes milk through an independent vendor in the Eastern Shore Counties of Dorchester, Somerset, Talbot, Wicomico, Worcester, Accomack, and Northampton, this area is basically rural in character and its inclusion in the area would bring under regulation a number of distributors do-

ing a large portion of their business in other parts of Maryland and the State of Delaware where Washington area handlers have little or no distribution. This distribution by the Washington handler constitutes a minor portion of his overall fluid business. It is neither administratively feasible nor necessary to include within the marketing area all of the territories in which Washington handlers do any business. Ideally, the established marketing area boundaries should encompass that area in which handlers who would be regulated do the preponderance of their business and should leave a minimum of competition with unregulated handlers outside the area. The inclusion of any part of the Eastern Shore area would not tend to implement this position, but would place local handlers serving the area in a disadvantageous position relative to their competition in their normal area of distribution outside of the marketing area." 24 F.R. 767, at 769; 24 F.R. 3630, at 3633.

The Order with which we are concerned in the instant cases was applied for by the Cooperative early in 1959, primarily because of the difficulties it was having with Sealtest Baltimore and the other Baltimore handlers, who had increasingly been making purchases from independent producers on a flat price basis, higher than the Cooperative's blend price. In 1956 the Cooperative had requested a hearing to consider a Federal order for the Baltimore market. Thereafter nine of the ten Baltimore dealers accepted the "Terms of Sale" offered by the Cooperative, which thereupon withdrew its request for an order. These so-called "Terms of Sale" became effective in February 1957; they provided for a price of $5.70 for Class I milk to be sold by Sealtest and the other City handlers in Baltimore City and the metropolitan area, but for a price of $5.30 for Class I

---

12. Willow Farms occasionally buys milk from this plant, but is not forced to do so since there is always an adequate supply of milk available from other sources.

13. The Eastern Shore business represents only about 5% of the Class I sales of these three handlers, and considerably less than that of the total business of all Baltimore handlers.

milk to be sold by the City handlers in such rural counties as Carroll County and the Eastern Shore. The validity of the "Terms of Sale" arrangement was at best debatable, Maryland and Virginia Milk Producers Ass'n, Inc. v. United States, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed. 2d 880, but is not involved in this case. The "Terms of Sale" arrangement expired in April 1958 and the City handlers renewed their efforts to buy independent milk. The percentage purchased from the Cooperative dropped from 88% in 1950 to about 70% in February 1959. The Cooperative began to lose members, some to Baltimore handlers' tank routes, some to Philadelphia handlers' tank routes. But there has never been a shortage of milk for Baltimore City or for any of the counties since the immediate post-war period. On the contrary, the problem has been one of an ever-increasing surplus.

The Baltimore City problem is similar to that existing in large city markets throughout the country. It is not a rural county problem, and particularly in Maryland is not contributed to by the county dairies, since they are not allowed to sell any milk in Baltimore City, although the City dairies can and do sell Class I milk in the counties.

The Secretary said that the rural counties were included in the marketing area because the exclusion of those counties "would place the regulated Baltimore dealers at a serious disadvantage with unregulated local dealers". In fact, the inclusion of the rural counties in the marketing area gives the Baltimore City dealers, with their large plants and facilities for disposing of Class II milk, a considerable competitive advantage over the local dairies. The Order makes it economically impossible for the county dairies to continue to pay their efficient farmers a higher price than the pool price, and thus takes away from the small county dairies the only effective weapon they had to compete with the Goliaths of the industry.

In the Willow Farms 608c(15) (A) proceeding the Judicial Officer conceded that "Carroll County was included within the marketing area, in part, to enable Baltimore City handlers and regulated milk to compete in the sale of milk with handlers in the counties outside Baltimore City". He said: "* * * we are unaware of any fatal infirmity of a legal nature inherent in the incorporation within the marketing area of an area of substantial distribution of milk by Baltimore handlers to be regulated under the order ancillary to the regulation of milk marketing in Baltimore and its environs. The fact that milk bottled in Carroll County may not be sold in Baltimore City because of municipal health ordinances which are of questionable validity (cf. Dean Milk Co. v. City of Madison et al., 340 U.S. 349 [71 S.Ct. 295, 95 L.Ed. 329] (1951); Supplee-Wills-Jones Milk Company v. Huntington Williams, decided July 9, 1956 (Cir.Ct. of Baltimore City)) does not in our opinion vitiate the regulation here in issue. Inability to market part of the milk regulated under an order in a section of the marketing area because of a so-called health regulation of the kind involved has not been a factor or test of practicality of regulation under orders issued pursuant to the act. * * * The Secretary has no jurisdiction over local ordinances of this nature and must concern himself with the *established flow* of milk. We do not believe that a program found desirable and necessary in the interests of milk producers has to be abandoned because of the restrictions hailed by petitioner. In any event, petitioner does not appear to desire or to be economically able to distribute bottled milk in Baltimore."

The statement of the Judicial Officer that "a so-called health regulation of the kind involved has not been a factor or test of practicality of regulation under orders issued pursuant to the act" appears to be contradicted by the Report, which says, II–2–2, "Other factors such as sanitary regulations and organization

of producers supplying the market are considered".

The tendency of such orders to benefit large national handlers was noted by Mr. Justice Roberts in his dissent in the Rock Royal case, 307 U.S. at 586–587, 59 S.Ct. at 1018–1019.[14] A bare majority of the Court, however, sustained the constitutionality of the order there involved, for the reasons set out in 307 U.S. at 568 et seq., 59 S.Ct. at 1010. The carefully specified guides and limitations placed on the Secretary were an essential element of that decision.

Whether or not the inclusion of Carroll County and the Eastern Shore counties in the marketing area was such a discrimination as would render the Order invalid (see discussion under "C" below), the purpose and effect of the Order, as set out above, require the Court to consider carefully whether the Secretary has complied with the requirements of the statute.

### Scope of Review

 The Judicial Officer correctly held that 608c(15) (A) affords "a means for adjudicating whether an order, a provision thereof, or an *obligation imposed in connection therewith* is 'not in accordance with law'," and that such an inquiry "does not encompass questions of policy, desirability, or the evaluation of the effectiveness of economic and marketing regulations promulgated pursuant to the act". The court review provided by 608c(15) (B) is similarly limited.[15] However, the fact that no challenge to the validity of an Order can be made except under 608c(15) (A) and (B), see United States v. Ruzicka, 329 U.S. 287, 67 S.Ct. 207, 91 L.Ed. 290, Willow Farms Dairy, Inc. v. Benson, D.Md., 181 F.Supp. 798, aff'd. 4 Cir., 276 F.2d 856, empha-

sizes the importance of strict observance by the Secretary of all conditions precedent to the issue of an order. The courts should see that he observes them. Stark v. Wickard, 321 U.S. 288, 310, 64 S.Ct. 559, 88 L.Ed. 733. "Even though procedural safeguards cannot validate an unconstitutional delegation, they do furnish protection against an arbitrary use of properly delegated authority." United States v. Rock Royal Co-op., 307 U.S. at 576, 59 S.Ct. at 1014, 83 L.Ed. 1446. "When the Secretary acts within the authority conferred by the statute, his findings of fact are conclusive. * * * But, in determining whether in conducting an administrative proceeding of this sort the Secretary has complied with the statutory prerequisites, the recitals of his procedure cannot be regarded as conclusive. Otherwise the statutory conditions could be set at naught by mere assertion." Morgan v. U. S., 298 U.S. 468, 477, 56 S.Ct. 906, 910, 80 L.Ed. 1288; American Airlines v. Civil Aeronautics Board, 98 U.S.App.D.C. 348, 235 F.2d 845, 853; Florida v. United States, 282 U.S. 194, 212 and 215, 51 S.Ct. 119, 75 L.Ed. 291; United States v. Pierce Auto Freight Lines, 327 U.S. 515, 533, 66 S.Ct. 687, 90 L.Ed. 821.

### A.

### Parity Prices

Plaintiffs contend that Order No. 127 is invalid because the Secretary failed to comply with the requirements of 608c (18). That section will be quoted in full, but for convenient reference each sentence will be set out in a separate paragraph:

"Milk Prices

*First Sentence.* "(18) The Secretary of Agriculture, prior to prescribing any

---

14. As well as by Judge Chesnut in Royal Farms Dairy v. Wallace, D.Md., 8 F.Supp. 975, at 986.

15. See e. g. Ogden Dairy Co. v. Wickard, 7 Cir., 157 F.2d 445, 447; Bailey Farm Dairy Company v. Jones, E.D.Miss., 61

F.Supp. 209, 217 aff'd sub nom. Bailey Farm Dairy Co. v. Anderson, 157 F.2d 87, cert. den. 329 U.S. 788, 67 S.Ct. 355, 91 L.Ed. 675; New York State Guernsey Breeders' Co-op. v. Wickard, 2 Cir., 141 F.2d 805, 153 A.L.R. 1165.

term in any marketing agreement or order, or amendment thereto, relating to milk or its products, if such term is to fix minimum prices to be paid to producers or associations of producers, or prior to modifying the price fixed in any such term, shall ascertain the parity prices of such commodities."

*Second Sentence.* "The prices which it is declared to be the policy of Congress to establish in section 602 of this title shall, for the purposes of such agreement, order, or amendment, be adjusted to reflect the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk or its products in the marketing area to which the contemplated marketing agreement, order, or amendment relates." [16]

*Third Sentence.* "Whenever the Secretary finds, upon the basis of the evidence adduced at the hearing required by section 608b of this title or this section, as the case may be, that the parity prices of such commodities are not reasonable in view of the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk and its products in the marketing area to which the contemplated agreement, order, or amendment relates, he shall fix such prices as he finds will reflect such factors, insure a sufficient quantity of pure and wholesome milk, and be in the public interest."

*Fourth Sentence.* "Thereafter, as the Secretary finds necessary on account of changed circumstances, he shall after due notice and opportunity for hearing, make adjustments in such prices."

The questions which will be considered under this heading are:

1. Whether the parity prices which the Secretary is required to "ascertain"

---

16. Sec. 602, referred to in the second sentence of 608c(18), deals with many commodities besides milk. In pertinent part, 602, as amended in 1948, declares it to be the policy of Congress—

"(1) Through the exercise of the powers conferred upon the Secretary of Agriculture * * * to establish and maintain such orderly marketing conditions * * * as will establish, as prices to farmers, parity prices as defined by sections 1301(a) (1) of this title.

"(2) To protect the interest of the consumer by * * * (b) authorizing no action under * * * 608c * * * of this title which has for its purpose the maintenance of prices to farmers above the level which it is declared to be the policy of Congress to establish in subsection (1) of this section."

Sec. 1301(a) (1) referred to in 602(1) is a 1948 amendment to subsection II (Loans) of the Agricultural Adjustment Act of 1938. It provides in pertinent part:

"(1) (A) The 'parity price' for any agricultural commodity, as of any date, shall be determined by multiplying the adjusted base price of such commodity as of such date by the parity index as of such date.

"(B) The 'adjusted base price' of any agricultural commodity, as of any date, shall be (i) the average of the prices received by farmers for such commodity, at such times as the Secretary may select during each year of the ten-year period ending on the 31st of December last before such date, or during each marketing season beginning in such period if the Secretary determines use of a calendar year basis to be impracticable, divided by (ii) the ratio of the general level of prices received by farmers for agricultural commodities during such period to the general level of prices received by farmers for agricultural commodities during the period January 1910 to December 1914, inclusive. As used in this subparagraph, the term 'prices' shall include wartime subsidy payments made to producers under programs designed to maintain maximum prices established under the Emergency Price Control Act of 1942.

"(C) The 'parity index,' as of any date, shall be the ratio of (i) the general level of prices for articles and services that farmers buy, wages paid hired farm labor, interest on farm indebtedness secured by farm real estate, and taxes on farm real estate, for the calendar month ending last before such date to (ii) the general level of such prices, wages, rates, and taxes during the period January 1910 to December 1914, inclusive.

"(D) The prices and indices provided for herein, and the data used in computing them, shall be determined by the Secretary, whose determination shall be final."

under the first sentence of 608c(18) are national parity prices or prices in the marketing area covered by the proposed order.

2. Whether the second sentence is surplusage, or a mere statement of policy, as the Secretary contends; or whether the Secretary must show that he has made the adjustment required thereby and the results of such adjustment.

3. Whether the Secretary must do more than repeat a portion of the third sentence of 608c(18) as his finding; whether he must make appropriate findings based upon evidence adduced at the hearing.

### 1.

The Secretary concedes that he did not find any parity price or parity prices, national or regional. He also concedes that there is no evidence of any parity price in the record, and that he did not consider any evidence outside the record in making his findings.[17] He argues that he was not required by the first sentence of 608c(18) to *find* any parity price or parity prices, but merely "[to] ascertain the parity prices of such commodities". The antecedent of "such" must be found in the first sentence of 608(c)(18) and is a subject of dispute, plaintiffs contending that it refers to the prices of the commodities in question in the marketing area to be regulated by the order, the Secretary that it refers to the national parity price.

Plaintiffs argue that if an order is to have any rational basis, the minimum prices fixed thereby must be related or compared to the prices—actual, parity or adjusted—for milk *in the marketing area,* not with an average of the prices in all 48 (now 50) states,[18] which might be higher or lower than the prices in the

marketing area. For example, the average prices received by farmers for milk, as of August 15, 1959, varied from $3.20 per cwt. in South Dakota to $6.80 in Florida, with a national average of $4.10, up from $3.90 in July. The Maryland price was $4.55 for both months.[19]

The Secretary argues that all he had to do was "ascertain", i. e. take notice of, the national parity price for "all milk" as calculated and published monthly, along with parity prices for other commodities, in "Agricultural Prices".[20] In August 1959 the effective national parity price for milk was $4.93. That price was determined by applying the "parity ratio" to the national average of prices received by farmers for milk. If the Maryland prices had been used, instead of the national average, a different result would have been obtained.

The Secretary contends (a) that he was required by 608c(18), 602 and 1301 (a) (1) to use the national figures, (b) that he could not find a parity price for the marketing area, because there is legally no such thing, (c) that "his decisions respecting parity are not subject to review", and (d) that it did not make any difference what parity price he ascertained, since he found that it was not reasonable and fixed the minimum prices in Order No. 127 without regard to national parity.

### (a)–(b)

Until about 1956 the Secretary regularly made findings with respect to parity prices for the particular marketing area under consideration; e. g. in the order reinstated subsequent to United States v. Rock Royal, supra, he referred to the "purchasing power of milk in the New York Metropolitan Marketing Area"[21]; in another case he re-

---

17. See Stipulation CR 12 and Answer to Question 14 CR 20.

18. The averages deal with 1959.

19. As reported in "Agricultural Prices", published monthly by the Agricultural Marketing Service, Crop Reporting Board, of the Department of Agriculture.

20. See n. 19, supra.

21. See Order No. 27 for the New York Marketing Area, reinstated by order of the Secretary of Agriculture, 3 F.R. 1000 D 1, 3 F.R. 1945.

ferred to "the parity price of milk handled in the Cincinnati, Ohio, marketing area." [22] It is true that when the two orders cited above were issued, the provisions of 602(1) were different from the present provisions.[23] But the 1948 amendments, effective in 1950, do not appear to have been intended to change the policy of the Agricultural Marketing Agreement Act, but to simplify the calculation of parity prices. The Secretary evidently did not believe that the policy had been changed; he continued to make findings referring to local parity prices, e. g. "The parity prices of milk produced for sale in the said marketing area as determined pursuant to section 2, of the act * * *." St. Louis Order, August 26, 1952, 17 F.R. 7883. Similar findings appear in many other orders issued after 1950.[24] Such findings dispose of the Secretary's contention that there is "legally no such thing" as a parity price for milk produced for sale in a particular marketing area; the Secretary is quibbling when he argues that this would not be

a parity price "but a parity equivalent".[25] Such findings do not of themselves completely answer the argument that the 1948–1950 amendments were intended to change the policy of this law; but the legislative history cited by the parties indicates that they were not so intended.[26] It should be noted that the second and third sentences of 608c(18) clearly relate to the particular marketing area under consideration.

### (c)–(d)

■ The Secretary's contention that "his decisions respecting parity are not subject to review" is doubtless sound with respect to the monthly figures he causes to be published showing the national parity prices of milk and other commodities, but it is not sound with respect to whether he has complied with the requirements imposed by 608c(18). See cases cited under "Scope of Review", supra.

The Secretary's contention that it does not make any difference what parity

22. See 3 F.R. 735.

23. The section then in effect is set out in United States v. Rock Royal Co-op., 307 U.S. at 545–546, 59 S.Ct. at 1000, 83 L.Ed. 1446.

24. In the instant case the Judicial Officer stated: "Congress intended by the amendment of our act that parity prices for the purpose of milk marketing agreements and orders should be the same kind of parity prices as under the Agricultural Adjustment Act of 1938, that is, on a national rather than on a local basis. This has been the consistent administrative interpretation since such amendments." This statement was not supported by any citation, and is contradicted by the orders cited in this note. See Order for the North Texas Marketing Area issued October 1, 1951 (16 F.R. 8420); Milwaukee Marketing Area, August 28, 1952 (17 F.R. 7884); Louisville, September 28, 1951 (16 F.R. 10050); and Cincinnati (16 F.R. 10051); Cincinnati again on May 1, 1955 (20 F.R. 2919, sec. 695.0(a) (2)); Order amending the New York Marketing Order effective December 22, 1951 (16 F.R. 12851, 12852); Boston, August 26, 1952 (17 F.R. 7768,

7769); Worcester, December 29, 1955 (20 F.R. 10045); Wheeling, May 1, 1956 (21 F.R. 1002); Clarksburg, April 30, 1956 (21 F.R. 2811).

25. At several points in the briefs filed on behalf of the Secretary and even in the decision of the Judicial Officer, it has been stated that the Secretary regularly followed a certain practice or used language in his orders, whereas plaintiff's counsel has been able to produce many examples from other milk orders published in the Federal Register, disproving such statements. This comment is not intended to reflect personally on the present or any other Secretary, or on any of his aides; a bureaucratic thicket has been allowed to obscure the paths and boundaries designated by Congress.

26. The Secretary's reliance upon a single sentence in a House Report in 1937, to show that the national parity price for milk was intended, is misplaced. There was no similar indication in the Senate Report, and from 1937 through the 1948 amendments until 1956 the Secretary regularly referred to the parity price in the marketing area rather than to the national parity price.

prices he ascertained, since he found that it was not reasonable, is surprising in the light of the stated purposes of the Act, in 602 as well as in 608c(18). It is, however, in line with the practice of the Department. The Report states, at p. III–8, "It is the judgment of this committee that the price 'parity' formula, however tenable in 1933 (in a 'temporary emergency' act) is economically unsuitable for fluid milk. It has in fact been superseded in the order program by the 'public interest' criterion, implemented by supply-and-demand pricing." Nevertheless, the requirements of sec. 608c(18) are not meaningless. Without those provisions the Secretary would have no standard to guide him and the Act might well have been declared unconstitutional as an illegal delegation of legislative authority. United States v. Rock Royal Coop., 307 U.S. at 574, 576, 577, 59 S.Ct. at 1013, 1014.

### 2.

The second sentence of sec. 608c (18) reads: "The prices which it is declared to be the policy of Congress to establish in section 602 of this title shall, for the purposes of such agreement, order, or amendment, be adjusted to reflect the prices of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk or its products in the marketing area to which the contemplated marketing agreement, order, or amendment relates".

Whether the prices which are to be adjusted are national parity prices or regional parity prices, the Act requires that they be adjusted to reflect the items referred to in the second sentence, and that such adjusted figure must be considered by the Secretary in making the finding required by the third sentence. In this case the Secretary made no such adjustment. The Judicial Officer, whose decision became the decision of the Secretary, stated in the 608c(15) (A) proceeding now under review: "It has never been the administrative practice either before or after the amendment of 8c(18) in 1948 to ascertain or find any such

adjusted parity price separate and apart from the finding prescribed in the third sentence of 8c(18). We believe that the second and the third sentences cover the same matter. The second sentence amends, in effect, the declaration of policy in section 2(1) but so does the third sentence and it does not make sense to say that the second sentence sets up a price level which under section 2(2) cannot be exceeded when the third sentence covers the second sentence with perhaps factors additional to those in the second sentence to be considered by the Secretary. We do not believe that there is any statutory mandate of ascertaining or finding anything under the second sentence separately from the third sentence."

The second sentence cannot be brushed aside so easily. As the Judicial Officer pointed out, the factors listed in the second sentence are not the same as the factors required to be considered in "fixing" prices under the third sentence. The second sentence has a purpose; the adjustment required thereby would yield a figure which Congress wished the Secretary to consider in deciding what is fair, to consumers as well as producers.. Whether or not the Secretary has habitually ignored the requirement imposed by the second sentence of 608c(18), it is a prerequisite of a valid order.

### 3.

The third sentence of 608c(18) reads: "Whenever the Secretary finds, upon the basis of the evidence adduced at the hearing required by section 608b of this title or this section, as the case may be, that the parity prices of such commodities are not reasonable in view of the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk and its products in the marketing area to which the contemplated agreement, order, or amendment relates, he shall fix such prices as he finds will reflect such factors, insure a sufficient quantity of pure and wholesome milk, and be in the public interest."

In sec. 1027.0 of Order No. 127, 24 F.R. 11071,[27] the Secretary made the following findings material to this point:

"(1) The said order, and all of the terms and conditions thereof, will tend to effectuate the declared policy of the Act;

"(2) The parity prices of milk as determined pursuant to section 2 of the Act are not reasonable in view of the price of feeds, available supplies of feeds, and other economic conditions which affect market supply and demand for milk in the said marketing area, and the minimum prices specified in the order are such prices as will reflect the aforesaid factors, insure a sufficient quantity of pure and wholesome milk and be in the public interest; * * * "

In his "Decision on The Proposed Marketing Agreement and Order", 24 F.R. 9441, the Secretary made elaborate "Findings and Conclusions" dealing with a variety of subjects,[28] as well as the "General Findings" quoted above, but he gave no indication (a) of any parity price which he might have ascertained, or (b) of any adjustment made thereto for any of the items specified in either the second sentence or third sentence of 608c(18). Although the voluminous record contained some evidence of feed prices, farm-wage rates, etc., paid by Maryland farmers over the years, there was no discussion of these matters in the "Findings and Conclusions" and nothing to show that any of the requirements of 608c(18) had been complied with, except the thrice-repeated findings (1) and (2), quoted above, parroting the bare language of the statute.[29] That is not enough to show that the Secretary has complied with the requirements for a valid order, as specified by the Congress.[30]

The cases cited by the Secretary do not require a different conclusion. In United States v. Rock Royal, supra, the Supreme Court said with a respect to the minimum prices to be established under a marketing order: "This price cannot be determined by mathematical formula but the standards give ample indications of the various factors to be considered by the Secretary". 307 U.S. at 577, 59 S.Ct. 993. In United States v. Turner Dairy Co., 7 Cir., 166 F.2d 1, the Court said that the language used was "such as to impel necessarily a finding that the Administrator had previously determined the parity prices of milk pursuant to Sections 2 and 8e [now 8c] of the Act. He must, of necessity, have determined them, for he proceeded to find that they were not reasonable in view of the price of feed, the available supplies of feed and other economic conditions that affect the market supply of and demand for milk, and having found that such parity prices were not reasonable, he proceeded to find that the minimum prices, prescribed by the order and set forth therein, were such as would reflect all of the aforesaid factors, insure a sufficient quantity of pure and wholesome milk and be in the public interest. The real question, so far as this handler is concerned, is whether the minimum prices fixed were proper. It matters not at all what the former determination of prices was, for, as the Administrator found, those prices had become no longer reasonably applicable to the producers' situation. Inasmuch as they had been found to be inadequate, so that it was necessary to disregard them and substitute for them new and

---

27. Omitted from the Order as included in 7 C.F.R. 1027, since such findings are usually not included in C.F.R.

28. "Character of Commerce", "Need for an Order", "Marketing Area", "Milk to be Priced", "Classification of Milk", "Determination and Level of Class Prices", "Class I Prices", "Class II Prices", "Butterfat Differentials", "Payments on Other Source Milk", "Type of Pool", "Producer-Settlement Fund", "Base and Excess Plan", "Payments to Individual Producers and Cooperative Associations", "Administrative Provisions".

29. "Just the Place for a Snark
I have said it thrice.
What I tell you three times is true."

30. See cases cited under "Scope of Review", supra, particularly American Airlines v. Civil Aeronautics Board, supra.

other minimum prices, what the former determination had been became irrelevant and unimportant." 166 F.2d at 4.

In Turner Dairy the Secretary had found that "the prices calculated to give milk produced for sale in said marketing area a purchasing power equivalent to the purchasing power of such milk, as determined pursuant to Sections 2 and 8(e) of said Act, are not reasonable in view of the prices of feeds * * * etc." See 166 F.2d at 4. It was not shown in that case, as Willow Farms has shown in the case at bar, (1) that the Secretary had not considered the parity price of milk sold in the marketing area; (2) that the Secretary did not regard such parity price as relevant; and (3) that there was no evidence in the promulgation proceeding relating to parity. These comments with respect to Turner Dairy apply also to Beatrice Creamery Co. v. Anderson, 75 F.Supp. 363 (1947).

The last sentence of the long passage quoted above from Turner Dairy is probably dictum; in any event, it is not supported either by the language of 608c (18) or by Rock Royal and other Supreme Court cases.

It is true, of course, as stated in Turner Dairy, that "the real question, so far as the handler is concerned, is whether the minimum prices fixed were proper". But if the Secretary does not set out in his findings and conclusions anything to show what parity prices, if any, he considered, and does not show what adjustments, if any, he made thereto, but bases his order upon a finding made in the bare language of the statute, while admitting (1) that he has not considered the parity price of milk sold in the marketing area, (2) that he does not regard such price as relevant, and (3) that he has not made and included in his findings and conclusions any adjustments of the national parity price to reflect the local factors, as required by the second sentence of 608c (18)—then a court cannot possibly determine "whether the minimum prices fixed were proper". See cases cited under "Scope of Review", supra. A court can, however, and in this case should, say that

the prices were not fixed in the manner required by the statute.

**B.**

*Producer Approval*

Willow Farms' second point is that the order is void because the Secretary did not make two of the determinations required by 608c(9).

The Secretary is authorized by 608c(8) to declare an order effective if it is agreed to by two-thirds of the handlers and approved by two-thirds of the producers. There was no such agreement by the handlers in this case. However, under 608c(9), the Secretary may nevertheless declare an order effective provided certain conditions are met. To make an order effective under 608c(9) the Secretary must determine:

A. That the refusal of the handlers "tends to prevent effectuation of the declared policy." 608c(9)(A).

B. "That the issuance of such order is the only practical means of advancing the interests of the producers of such commodity pursuant to the declared policy, and is approved and favored:

"(i) by at least two-thirds of the producers * * * who, during such representative period, have been engaged in the production of such commodity for sale in the marketing area specified in such marketing agreement, or order * * *." 608c(9)(B).

In the instant case, the Secretary did not make the determinations required by 608c (9) (B). Instead, he made the following determinations:

"(c) *Determinations.* It is hereby determined that * * *

"(2) The issuance of this order is the only practical means pursuant to the declared policy of the Act of advancing the interest of producers *as defined in the order;* and

"(3) The issuance of this order is approved or favored by at least two-thirds of the producers *who participated in a referendum,* and who during the determined representative period were engaged in the production of milk for sale

in the marketing area." 24 F.R. 11071. (Emphasis supplied).

The difference between the determinations as required by the statute and the determinations as actually made by the Secretary was not inadvertent, nor a matter of minor importance. The right to vote in the referendum was in fact limited to producers as defined in the order.[31]

The term "producer" is not defined in the statute. It was defined in the Order, sec. 1027.2(e), 24 F.R. 11072, as follows: "(e) 'Producer' means any dairy farmer, except a producer-handler or a dairy farmer for other markets, who produces milk which is received at a pool plant or is diverted to a nonpool plant during any month(s) of March through August or on not more than 8 days (4 days in the case of every-other-day delivery) during any month(s) of September through February; Provided, That the milk so diverted shall be deemed to have been received by the diverting handler at a pool plant at the location from which it was diverted." No complaint has been made about the fixing of the representative period, but it is clear that the definition of "producer" contained in the Order excludes many farmers who, during the representative period, produced milk for sale within the marketing area. Plaintiffs dispute the right of the Secretary to limit by definition the producers whose milk is to be covered by the provisions of the Order. If the Secretary has such right the limitation set out in sec. 1027.2 (e) of the Order does not seem unreasonable. But what may be reasonable as a restriction on the *coverage of the order* is not necessarily reasonable as a restriction on *those entitled to vote*.

The Order affects many persons—both producers and handlers—who are not directly covered by it. It affects all producers who during the specified period were engaged in the production of milk for sale in the marketing area covered by the marketing agreement. No doubt, it was for that reason that Congress required that all such producers be entitled to vote in the referendum. In the instant case, however, the definition of "producer" contained in the Order, and the action of the Secretary in limiting the vote to producers as defined in the Order, so restricted the electorate that most of those entitled to vote were members of the Cooperative which was actively promoting the proposed Order. And, since the Cooperative voted for all of its members, it was impossible for those producers who were opposed to the proposed Order to make their opposition effective.

The Secretary contends that the definition of producer in the Order was merely a reasonable test for determining what producers qualified to vote under the provisions of 608c(9) (B) (i), quoted above. But no such narrow definition was permitted by the plain language of the statute.

The Secretary's brief repeats the argument of the Judicial Officer that H. P. Hood & Sons v. United States, 307 U.S. 588, 59 S.Ct. 1019, 83 L.Ed. 1478, and United States v. Wrightwood Dairy Company, 7 Cir., 127 F.2d 907, justify the narrow definition of those entitled to vote in the referendum. In Hood, the Secretary defined producers as all persons

31. The referendum was ordered by the Secretary on November 20, 1959 (24 F.R. 9455) "to determine whether the issuance of the attached order regulating the handling of milk in the Upper Chesapeake Bay, Maryland marketing area is approved by the producers, *as defined under the terms of the proposed order*, and who during the representative period were engaged in the production of milk for sale within the aforesaid marketing area." (Emphasis supplied).

The regulations governing the referendum expressly provided: "Each producer, *as defined by the order* * * * shall be entitled to one vote * * *" (emphasis supplied). Radigan, the agent designated by the Secretary to conduct the referendum, issued a notice stating: "Producers eligible to vote are those who during August 1959, were included within the 'Producer' definition contained in section 1027.2(e) of the order." He did not permit any farmer to vote who was not a producer *as defined in the order.*

producing milk in conformity with the health regulations applicable to milk sold for consumption in the marketing area, and restricted voting in the referendum under scrutiny to producers who had delivered milk to a station approved for the shipment of milk to the marketing area and which had shipped milk or cream to the marketing area during the representative period. The Court held that this was a reasonable means of determining those who should be entitled to vote, and that exclusion of certain producers was proper, saying: "The milk of the southern and western producers outside the milk-shed could not be sent into the marketing area in fluid form, for their handlers were not licensed to sell milk in the area. The station in Indiana, used in the hearings as illustrative of the situation, held a license for the emergency shipments of sweet cream only. The exclusion of the southern and western producers, therefore, was proper. They are located outside the Boston milk-shed; they do not produce any part of the burdensome surplus of fluid milk." 307 U.S. at 598, 59 S.Ct. 1025. In Wrightwood Dairy, the Secretary limited participation in the vote to those producers who were delivering milk to handlers engaged in the marketing of fluid milk in the regulated areas. The Court stated that since only such producers were affected by the Order they were the only ones entitled to participate in the referendum, and the Secretary had properly excluded from the vote those producers engaged only in producing milk for processing into butter, cheese, etc. In the instant case, however, the evidence shows that the Secretary excluded from the referendum an undetermined number of farmers who *are* affected by the Order. Not only did the Secretary carefully tailor the marketing area to benefit the Cooperative and the Baltimore City handlers, but by his definition of producer he limited the election to such an extent that the intention of Congress was ignored, and the will of the Cooperative was bound to prevail. The decisions cited by the Secretary do not justify that limitation.

In a case involving the antitrust laws, the Supreme Court has recently said that the Capper-Volstead Act, 7 U.S.C.A. §§ 291, 292 "does not suggest a congressional desire to vest cooperatives with unrestricted power to restrain trade or to achieve monopoly by preying on independent producers, processors or dealers intent on carrying on their own business in their own legitimate way". Md. & Va. Milk Pro. Ass'n v. United States, 362 U.S. 458, 466–467, 80 S.Ct. 847, 853, 4 L.Ed. 2d 880. The Secretary may not aid the Cooperative to accomplish indirectly, through means of an Order, objectives which it could not accomplish otherwise, unless the statutory prerequisites are scrupulously observed.

The Judicial Officer also relied on the fact that plaintiffs have not produced any dairy farmers who were deprived of their right to vote "except perhaps the members of a Minnesota cooperative which apparently shipped cream into the marketing area". However, plaintiffs were entitled to a referendum carried out according to the terms prescribed in the statute. The fact that certain producers were not afforded an opportunity to vote or, according to the evidence, to have their votes counted, violated plaintiffs' rights under the statute as well as the rights of such producers.

### C.

#### *Discrimination*

Plaintiffs contend that the inclusion of the counties in the same marketing area as the City is arbitrary and illegal and discriminates against the county handlers. The facts which give rise to this contention are set out above under the heading "The Plaintiffs, the Cooperative and the Large Baltimore Handlers".

Plaintiffs do not attack market pools as such; pools are authorized by the Act and were approved by the Supreme Court in Rock Royal and Hood, supra. But the majority opinion in Rock Royal, which was followed in Hood, carefully distinguished two earlier cases in which pool-

ing arrangements had been disapproved, in one case, Thompson v. Consolidated Gas Utilities Corp., 300 U.S. 55, 57 S.Ct. 364, 81 L.Ed. 510, because the purpose of the pool involved "was not deemed reasonably related to the conservation of gas or the protection of correlative rights", and in the other, Railroad Retirement Board v. Alton R. Co., 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468, because "the burdens on the roads were not equalized with the benefits". 307 U.S. at 573, 59 S.Ct. at 1013.

The order with which we are dealing in the instant case was passed because of the difficulties the Cooperative was having with the city handlers, and the resulting surplus of milk in the hands of the Cooperative which it could not dispose of as Class I milk. The county handlers and the farmers who sell to them do not contribute to that surplus, because their milk cannot be sold in the City. Nevertheless, the Secretary included the rural counties in the marketing area because some of the city dairies, notably National, sell in those counties.

Naturally the large City handlers and the Cooperative, which desired and needed a pool for the City market, wanted the Secretary to include the county dairies in the pool, because as a result of the greater Class I use by the county dairies they were bound to contribute more than they took out, and would to that extent subsidize the City handlers. It cannot be said that there is no evidence in the record to support the decision of the Secretary, but on the record taken as a whole it does not appear that the Secretary gave due regard to the equalization of the burdens with the benefits. He included Carroll County and other rural counties in the marketing area in order to include the county handlers and their farmers in the pool, for the sole benefit of the City handlers and the Cooperative, and to the detriment of the county handlers and the farmers who sell to them, without any corresponding benefit to the county handlers and their farmers. That action was contrary to

the principles applied in Thompson v. Consolidated Gas and Railroad Retirement Board v. Alton R. Co., supra, and recognized in the Rock Royal and Hood cases.

Plaintiffs also cite the following passage in the Rock Royal case: "The Act authorizes a marketing agreement and order to be issued for such production or marketing regions or areas as are practicable. A city milkshed seems homogeneous. This standard of practicality is a limit on the power to issue orders. It determines when an order may be promulgated." 307 U.S. at 576, 59 S.Ct. at 1014.

Mills et al. argue that this passage requires that the marketing area be homogeneous, and that the inclusion of the rural counties, especially those on the Eastern Shore, destroys such homogeneity. The test appears to be practicality, rather than homogeneity, but Mills' argument is supported by the Report, which states, II-2-1, 2: "It is significant also that in Section 608c(11) (B) of the Agricultural Marketing Agreement Act, orders pertaining to milk were made an exception to the general requirement that orders—'shall be limited in their application to the smallest regional production areas or regional marketing areas * * * which the Secretary finds practicable * * *'. Thus the Act has imposed no direct limitation on the extent of marketing areas as defined in Federal milk orders. However, the Act is interpreted by the Department to require that milk marketing orders be issued for marketing areas in which the conditions of demand and supply are reasonably homogeneous." The lack of homogeneity between the Eastern Shore counties and Baltimore City is essentially the same as the lack of homogeneity between those counties and Washington, D. C., at the time when National Dairy Products Co. was supplying Clark Brothers from Sealtest Washington rather than from Sealtest Baltimore. In promulgating the Washington Order in May 1959, just a few months after the pro·

mulgation hearings on Order 127 began, the Secretary refused to include the Eastern Shore in the Washington area for the reasons set out in the passage quoted above under the heading "The Plaintiffs, the Cooperative and the Large Baltimore Handlers". Those reasons would seem to apply also to Order 127, especially in view of the fact that the county handlers are prohibited from selling in Baltimore City by the City health regulations. As we have seen, the inclusion of the counties in the marketing area effectively prevents the county dairies from continuing the arrangements with their farmers under which, as a result of cooperation between the dairies and the farmers, the county surplus has been kept under control and the county dairies have been able to pay the farmers a higher price for their milk.

The Secretary argues that a handler may not complain because one producer or group of producers receives greater benefits from the pool than another. Perhaps that is true in the ordinary case. But this is not an ordinary case, since the very purpose of including the rural counties in the Order was to benefit not only certain producers but also the City handlers as against plaintiffs and other small county handlers. That may not legally be done.

In any event, the farmers who sell to plaintiffs and other county handlers have a right to complain, because they are losing the differential which they have heretofore earned by controlling their surplus. They are being forced to contribute to a pool from which they can derive no benefit, which was set up to cure a problem they did not create, and which operates, as it was intended to operate, for the sole benefit of the farmers who produce for the City market, the Cooperative and the City handlers. A majority of the farmers who sell to the plaintiffs in each case have asked leave to intervene on the side of the plaintiffs. The Secretary contends that the producers may not intervene in these cases, but must sue the Secretary in Washington. However, in one of the earlier cases in the present series, 181 F. Supp. 798, the Secretary welcomed the intervention of the Cooperative on his side. The interests of justice require that the farmers be allowed to intervene in these cases so that all points may be fully considered and adjudicated.

### D.

Counsel for Willow Farms developed a quantity of points before the Judicial Officer and in his complaint. Some were dropped before the argument, but he still contends that the "compensatory payment" provisions of the Order are discriminatory, as is the provision permitting the Cooperative to qualify as a pool handler; that the Order permits the multiple plant city dairies to divert milk among various plants so as to achieve non-uniform price classifications under the Order; and that the Order contains other discriminatory features. A similar "compensatory payment" provision has recently been held invalid by the Supreme Court of the United States, Lehigh Valley Co-op Farmers, Inc. v. United States, 82 S.Ct. 1168, but plaintiffs have not shown how they are hurt by this provision; nor have the intervening producers. All of the other points were discussed in the decision of the Judicial Officer. That decision and the arguments advanced by the Secretary in his brief show either that there was no discrimination involved in the provisions complained of, or that any such discrimination could not possibly hurt the plaintiffs.

Similarly, counsel for Mills et al. have raised a host of procedural questions, none of which merit detailed consideration, although his request that the Secretary himself hear and consider the case, as permitted by sec. 900.71 of the Rules of Practice, 7 C.F.R. 900.71, emphasizes the extent to which such proceedings have become the province of well-meaning bureaucrats, with little or no personal attention from the Secretary, and with insufficient attention to the limitations placed on their action by the Congress and by established constitutional principles.

258

## Conclusion

For each of the reasons discussed under A, B and C, above, the rulings of the Secretary are not in accordance with law. Plaintiffs are entitled to have Order No. 127 declared invalid, or to be exempted therefrom on the ground that they were improperly included therein. Counsel will prepare an appropriate judgment order, under the provisions of 608c(15) (B).